CLERKS OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED
01/02/2026
LAURA A. AUSTIN, CLERK
BY:  s/ J. LOPEZ
     DEPUTY CLERK

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**LYNCHBURG DIVISION**

| | |
|---|---|
| ASHLEY FITCH, individually and on behalf of all others similarly situated, | ) <br> ) <br> ) |
| Plaintiff, | ) **CIVIL ACTION NO.:**   6:26CV1 |
| v. | ) <br> ) |
| CENTRA HEALTH, INC., CENTRA HEALTH, INC. RETIREMENT SAVINGS PLANNING COMMITTEE, and JOHN DOES 1-10, | ) **CLASS ACTION COMPLAINT** <br> ) <br> ) <br> ) |
| Defendants. | ) <br> ) |

Plaintiff, Ashley Fitch ("Plaintiff"), by and through her attorneys, on behalf of the Centra

Health Matching Tax Deferred Savings Plan (the "Plan"),[1] herself and all others similarly situated,

states and alleges as follows:

**I.     INTRODUCTION**

1.      This is a class action brought pursuant to §§ 409 and 502 of the Employee

Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the

Plan's fiduciaries, Centra Health, Inc. ("Centra Health" or "Company") and the Centra Health, Inc.

Retirement Savings Planning Committee ("Committee"), during the Class Period, for breaches of

their fiduciary duties.

2.      The Plan is a defined contribution plan, established pursuant to 29 U.S.C. §

1002(2)(A) and § 1002(34) of ERISA, that enables eligible participants to make tax-deferred

contributions from their salaries to the Plan. *See* Independent Auditor's Report ("Auditor's

---

[1] The Plan is a 403(b) tax deferred annuity plan. The Plan is a legal entity that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party. Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

Report"), attached to 2023 Form 5500 for the Plan, at 8 ("The Plan is a defined contribution plan established by Centra Health, Inc. (the "Plan Sponsor" or "Employer") in January 1985, which was amended and restated effective January 1, 2022.").

3.      To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B). These twin fiduciary duties are "the highest known to the law." *Tatum v. RJR Pension Investment Committee et al*., 761 F.3d 346, 356 (4th Cir. 2014).

4.      The Department of Labor ("DOL") has also explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, "establish a prudent process for selecting investment options and service providers."[2] *See also Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1823 (2015) ("*Tibble I*") (reaffirming the ongoing fiduciary duty to monitor a plan's investment options).

5.      Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of investment options. "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act (the "UPIA"), § 7.

6.      "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but

---

[2] *See* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Sept. 2019), at 2, available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited September 25, 2025).

also in monitoring and reviewing investments.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (*en banc*) (quoting Restatement (Third) of Trusts, § 90, cmt. b) ("*Tibble II*").

7.    The Supreme Court reiterated that interpreting "ERISA's duty of prudence in light of the common law of trusts" a fiduciary "has a continuing duty of some kind to monitor investments and remove imprudent ones" and a plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones. *Hughes v. Nw. Univ.*, 595 U.S. 170, 175, 142 S. Ct. 737, 741, 211 L. Ed. 2d 558 (2022).

8.    Plaintiff alleges that during the putative Class Period, Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, to Plaintiff, and to the other participants of the Plan by, *inter alia*, failing to objectively and adequately review the Plan's investment portfolio, initially and on an ongoing basis, with due care to ensure that each investment option was prudent, in terms of performance.

9.    At all times during the Class Period, the Plan had at least five hundred million dollars in assets under management. At the Plan's fiscal year end in 2020, the Plan had $661,578,023 in assets under management that were/are entrusted to the care of the Plan's fiduciaries. *See* 2020 Form 5500 for the Plan, Schedule H, at 2.

10.    By 2024, the Plan had $669,994,115 in assets under management. *See* 2024 Form 5500 for the Plan, Schedule H, at 2.

11.    The Plan is also large in terms of the number of its participants. At the beginning of the Class Period, the Plan had 9,434 participants. *See* 2020 Form 5500 for the Plan, at 2. By 2024, the Plan had 10,247 participants. *See* 2024 Form 5500 for the Plan, at 2.

3

12.     With regard to the Plan's investments, Defendants breached their fiduciary duty of prudence by selecting and/or maintaining a certain guaranteed investment fund with lower crediting rates when compared to available similar or identical investments with higher crediting rates. The crediting rate is the guaranteed rate of return for the investment fund.

13.     Specifically, Defendants allowed substantial assets in the Plan to be invested in a Transamerica Financial Life Insurance Company ("Transamerica" or "TFLIC") Guaranteed Income Option ("TFLIC GIO"). The TFLIC GIO carried more risk and provided a significantly lower rate of return than other comparable stable value funds that Defendants could have made available to Plan participants, including a Transamerica guaranteed investment contract that was available in Transamerica's 401(k) plan for its employees.

14.     Transamerica benefited significantly from Plan participants being invested in the TFLIC GIO. The assets invested in the TFLIC GIO were held and invested by Transamerica, which kept the spread (the difference between the amount Transamerica earned on the investments and the amount Transamerica paid to Plan participants). The crediting rates that Transamerica provided to investors in the TFLIC GIO were/are so low that Transamerica reaped a windfall on the spread.

15.     Plaintiffs also allege that the Defendants engaged in prohibited transactions with a party-in-interest. Specifically, Defendants breached their fiduciary duties of prudence by allowing a party-in-interest, Transamerica,[3] to benefit from its provision of services to the Plan by receiving excessive compensation for managing the TFLIC GIO.

---

[3] "Certain Plan investments and notes receivable from participants are managed by the Custodians. In addition, certain Plan investments are managed by Transamerica. Transamerica is the recordkeeper for these certain Plan investments. Notes receivable from participants are also considered to be party-in-interest transactions." Auditor's Report, attached to 2023 Form 5500 for the Plan, at 15.

16.     The arrangements and transactions with Transamerica are prohibited transactions because they "amount[] to a 'direct or indirect ... furnishing of services ... between the plan and a party in interest,' 29 U.S.C. § 1106(a)(1)(C)." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 601 (8th Cir. 2009).

17.     Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duty of prudence, in violation of 29 U.S.C. § 1104. Their actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

18.     Based on this conduct, Plaintiff asserts claims against Defendants for breach of the fiduciary duty of prudence (Count I), failure to monitor fiduciaries (Count II), and violation of ERISA's prohibited transactions (Count III).

## II.     JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

20.     This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

21.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District. Venue is also proper in this District pursuant

to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

III.  **PARTIES**

**Plaintiff**

22.     Plaintiff, Ashley Fitch ("Fitch"), resides in Lynchburg, Virginia. During her employment, Plaintiff Fitch participated in the Plan. Ms. Fitch invested in the TFLIC GIO in the Plan and suffered injury to her Plan account due to the significant underperformance of the TFLIC GIO.

23.     Plaintiff has standing to bring this action on behalf of the Plan because she participated in the Plan and was injured by Defendants' unlawful conduct.  Plaintiff is entitled to receive benefits in the amount of the difference between the value of her account currently, or as of the time her account was distributed, and what her account is or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

24.     Plaintiff did not have knowledge of all material facts (including, among other things, the investment alternatives that are comparable to the investments offered within the Plan, comparisons of the costs and investment performance of Plan investments versus available alternatives within similarly-sized plans) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

**Defendants**

**Company Defendant**

25.     Centra Health, Inc. is the Plan Sponsor and a named fiduciary of the Plan with a principal place of business at 1920 Atherholt Road, Lynchburg, Virginia. *See* the 2023 Form 5500

6

at 1. Centra "is a regional nonprofit healthcare system based in Lynchburg, Virginia, serving over 500,000 people as the dominant provider of critical medical services in central and southern Virginia."[4]

26.    "The Plan is administered by the Plan Sponsor, which serves without compensation. The Plan Administrator has the overall responsibility and authority as the named fiduciary to manage and control the operations and administration of the Plan and may designate one or more individuals to perform those responsibilities." *See* 2024 Form 2200 for the Plan, at 8.

27.    Centra Health appointed the Retirement Savings Planning Committee to, among other things, ensure that the investments available to Plan participants are appropriate, had no more expense than reasonable and performed well as compared to their peers. As will be discussed below, the Committee fell well short of these fiduciary goals. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

28.    Accordingly, Centra Health during the putative Class Period is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because it had a duty to monitor the actions of the Committee.

29.    For the foregoing reasons, the Company is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

**Committee Defendants**

30.    The Centra Health, Inc. Retirement Savings Planning Committee and its members exercise discretionary authority over management or disposition of plan assets. *See* Retirement Savings Planning Committee Charter ("Committee Charter"), at 2 ("The primary purpose of the Retirement Plan Committee is to oversee the investment portfolio and service providers to the

---

[4] https://www.centrahealth.com/about-centra last accessed on November 4, 2025.

'Plan'. The Retirement Plan Committee also has general responsibility and oversight for the administration and compliance of the 'Plan'.").

31.    Specifically, the Committee, "shall have the following responsibilities: 1. Supervise the investment of assets of the plan in accordance with ERISA.; 2. Establish an Investment Policy Statement for the 'Plan' that provides a methodology for the ongoing retention and oversight of the 'Plan' investments.; 3. Review and approve and/or replace investments in the 'Plan' using the guidelines set out in the Investment Policy Statement. … ." Committee Charter, at 2.

32.    The Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of Plan assets.

33.    The Committee and unnamed members of the Committee during the Class Period (referred to herein as John Does 1-10), are collectively referred to herein as the "Committee Defendants."

## IV.    CLASS ACTION ALLEGATIONS[5]

34.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of herself and the following proposed class ("Class"):[6]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Centra

---

[5] Although this is a proposed class action, the allegations in this complaint are alternatively pled in derivative fashion on behalf of the Plan because class certification is not necessarily required for Plaintiff to prosecute claims on behalf of the Plan and all participants. *See, e.g*., *In re: Wilmington Trust Corp.,* 2013 WL 4757843, at *3 (D. Del. Sept. 4, 2013) (granting plaintiffs' motion to proceed derivatively on behalf of all plan participants without class certification, because of the nature of such claims). ERISA Section 502(a), 29 U.S.C. § 1132(a), authorizes pension plan participants to bring suit on behalf of a plan to recover losses to a plan.

[6] Plaintiff reserves the right to propose other or additional classes or subclasses in the motion for class certification or subsequent pleadings in this action.

Health Matching Tax Deferred Savings Plan, at any time between September 28, 2020 through the December 31, 2024[7] (the "Class Period").

35. The members of the Class are so numerous that joinder of all members is impractical. The 2023 Form 5500 lists 10,247 Plan "participants with account balances as of the end of the plan year." *See* 2023 Form 5500, at 2.

36. Plaintiff's claims are typical of the claims of the members of the Class. Like other Class members, Plaintiff participated in the Plan and has suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated the Plaintiff consistently with other Class members and managed the Plan as a single entity. Plaintiff's claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

37. There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

    A.    Whether Defendants are/were fiduciaries of the Plan;

    B.    Whether Defendants breached their fiduciary duties of prudence
        by engaging in the conduct described herein;

    C.    Whether the Company failed to adequately monitor the Committee and
        other fiduciaries to ensure the Plan was being managed in compliance with
        ERISA;

---

[7] The end of the Class Period is subject to change. At some point in 2024, Defendants removed the TFLIC GIO as an investment fund available to Plan participants, which further supports Plaintiff's argument that the TFLIC GIO should never have been offered as an investment option for Plan participants.

        D.     The proper form of equitable and injunctive relief; and

        E.     The proper measure of monetary relief.

38.    Plaintiff will fairly and adequately represent the Class and has retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiff has no interests antagonistic to those of other members of the Class. Plaintiff is committed to the vigorous prosecution of this action and anticipates no difficulty in the management of this litigation as a class action.

39.    This action may be properly certified under Rule 23(b)(1). Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

40.    In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## V.   THE PLAN

41.    The Company established the Plan in January 1985, for the benefit of its employees. *See* Auditor's Report attached to 2023 Form 5500 for the Plan, at 8.

42.    The Plan, "was amended and restated effective January 1, 2022." *Id*.

43.     The Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participant's account. Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account.

44.     Effective September 28, 2020, the TFLIC GIO was an investment fund available in the Plan. *See* Amendment No. 9 to the Transamerica Retirement Solutions, LLC Pension Services Agreement ("This Agreement is hereby amended as follows: I. Effective September 28, 2020 … 2. By the addition of the following Investment Option(s) to the Investment Options Schedule …: Transamerica Guaranteed Investment Option.").

45.     At the end of 2020, $69,443,501 in Plan assets were invested in the TFLIC GIO. *See* Schedule H, Line 4i – Schedule of Assets (Held at End of Year), attached to 2019 Form 5500 for the Plan, at 15.

46.     At the end of 2023, over $64 million in Plan assets were invested in the TFLIC GIO. *See* Schedule H, Line 4i – Schedule of Assets (Held at End of Year), attached to 2023 Form 5500 for the Plan, at 19.

47.     The chart below demonstrates the amount of Plan assets invested in the TFLIC GIO during the Class Period.

| Plan Year | Plan Assets in TFLIC GIO |
|-----------|--------------------------|
| 2020 | $69,443,501 |
| 2021 | $67,735,735 |
| 2022 | $68,798,562 |
| 2023 | $64,698,240 |

### *Eligibility*

48.     In general, the Plan covers all employees of Centra Health on their first day of employment. *See* Auditor's Report attached to 2023 Form 5500 for the Plan, at 8 ("Employees are eligible to participate in the Plan on the first day of employment with the Plan Sponsor.").

### *Contributions*

49.     There are several types of contributions that can be added to a participant's account. *See* Auditor's Report attached to 2023 Form 5500 for the Plan, at 9 ("For the year ended December 31, 2023, participants may contribute up to $22,500 of pre-tax annual compensation subject to certain Internal Revenue Code ("IRC") limitations. Once eligible, participants may also contribute amounts representing distributions from other qualified retirement plans, 403(b) tax sheltered annuity plans, governmental 457(b) plans, and traditional individual retirement accounts.").

50.     The Plan also provides "a Plan Sponsor matching contribution of 100% of each eligible participant's contributions up to 3% of compensation during the Plan year. In addition, certain participants who have turned 50 and achieved 15 years of service with the Plan Sponsor prior to December 31, 2010, are eligible for an additional non-elective contribution equal to 2% of the participant's eligible compensation. The Plan also provides for an additional discretionary non-elective contribution." *Id*.

51.     Like other companies that sponsor 401(k) plans for their employees, Centra Health enjoys both direct and indirect benefits by providing matching contributions to Plan participants. Employers are generally permitted to take tax deductions for their contributions to 401(k) plans at the time when the contributions are made. *See generally*, https://www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview.

52.     Centra Health also benefits in other ways from the Plan's matching program. It is well-known that "[o]ffering retirement plans can help in employers' efforts to attract new employees and reduce turnover." *See* https://www.paychex.com/articles/employee-benefits/employer-matching-401k-benefits.

53.     Given the size of the Plan, Centra Health likely enjoyed significant tax and cost savings from offering a match.

## VI.    THE TOTALITY OF THE CIRCUMSTANCES DEMONSTRATES THAT DEFENDANTS FAILED TO ADMINISTER THE PLAN IN A PRUDENT MANNER

### A.     ERISA Fiduciaries Are Held to the Highest Standards Regarding Process and Methodology of Evaluating Investments

54.     As described in the "Parties" section above, Defendants were fiduciaries of the Plan.

55.     ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted). In addition to a duty to select prudent investments, under ERISA, a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble I*, 135 S. Ct. at 1828; *see also Hughes*, 142 S. Ct. at 741.

56.     As stated by the DOL: ERISA "requires plan fiduciaries, when selecting and monitoring service providers and plan investments, to act prudently and solely in the interest of the plan's participants and beneficiaries. Responsible plan fiduciaries also must ensure that arrangements with their service providers are 'reasonable' and that only 'reasonable' compensation is paid for services. ..." DOL 408(b)(2) Regulation Fact Sheet.

57.    The duty "…to act solely in the best interest of participants has been a key tenet of ERISA since its passage." "Best Practices for Plan Fiduciaries," at 36, published by Vanguard, 2019.[8]

58.    Acting in the sole interest of plan participants is all encompassing. A fiduciary must monitor all investment options in a 401(k) plan as a prudent investment professional. *See* the U.S. Department of Labor, Employee Benefits Security Administration (EBSA)'s "Meeting Your Fiduciary Responsibilities," at 2 ("The duty to act prudently is one of a fiduciary's central responsibilities under ERISA. It requires expertise in a variety of areas, such as investments."), available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities.pdf.

59.    A prudent investment professional, and hence a fiduciary, must regularly evaluate a fund's performance history, the portfolio manager's experience and tenure, changes to the fund's investment strategy, changes to the underlying assets in the investment, total assets under management within the fund, fees, and other relevant factors.

60.    With respect to investment returns, diligent investment professionals monitor the performance of their selected investments using appropriate industry-recognized "benchmarks" and prudently managed equivalents.

61.    The measurement of investments against prudently managed alternatives is critical given that these alternatives represent other investments available to a plan, which may increase the likelihood that participants reach/live their preferred lifestyle in retirement.

---

[8] Available at https://institutional.vanguard.com/iam/pdf/FBPBK.pdf?cbdForceDomain.

62.     Whether a plan fiduciary enlists the assistance of an investment manager, consultant, or advisor, the plan's fiduciaries are not relieved of fiduciary liability for selecting and monitoring the plan's investment options.

63.     It is black letter law that a fiduciary's duty to conduct an "independent investigation into the merits of a particular investment," is the "most basic of ERISA's investment fiduciary duties." *In re Unisys Savings Plan Litigation*, 74 F.3d 420, 435 (3d Circ. 1996). *Hughes*, 142 S. Ct. at 738 (noting ERISA fiduciaries are required to "conduct their own independent evaluation to determine which investments may by prudently included in the plan's menu of options.").

64.     It may also indicate a lack of adequate care and attention to ignore sound advice provided by investment advisors.

65.     To the extent plan fiduciaries have adopted an investment policy statement, as was required pursuant to the terms of the Committee Charter (*see* Committee Charter, at 2 ("The Retirement Plan Committee shall have the following responsibilities: … Establish an Investment Policy Statement for the 'Plan' that provides a methodology for the ongoing retention and oversight of the 'Plan' investments.")), those fiduciaries "must comply with the plan's written statements of investment policy, insofar as those written statements are consistent with the provisions of ERISA." *Lauderdale v. NFP Retirement, Inc.*, 2022 WL 17260510, at * 10 (S.D. Cal. Nov. 17, 2022). That is, the investment policy statement must be written with the sole interest of the plan participant in mind.

66.     Plaintiff did not have and does not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for selecting, monitoring, and removing the Plan's investments and fees because this information is solely within the possession of Defendants prior to discovery. *See*

*Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.").

67.    In fact, in an attempt to discover the details of the Plan's mismanagement, Plaintiff first wrote to the Plan administrator on December 19, 2022 to request, among other things, "all written instruments" governing or pertaining to the Plan, including "Investment Policy Statements, and amendments, exhibits, or appendices thereto[,]" "Investment Management Contracts, or other instruments under which the Plan was established or operated, and all amendments, exhibits, or appendices thereto," and as well as any committee's meeting minutes. This request was made pursuant to Section 104(b)(4) of ERISA.

68.    By correspondence dated January 18, 2023 and March 15, 2023, the Plan administrator provided select, but not all, meeting minutes. However, the Plan administrator did not produce any investment policy statement(s).

69.    Reviewing meeting minutes and investment policy statements, when they exist, is the bare minimum needed to peek into a fiduciary's monitoring process. But in most cases even that is not sufficient. For, "[w]hile the absence of a deliberative process may be enough to demonstrate imprudence, the presence of a deliberative process does not … suffice in every case to demonstrate prudence.  Deliberative processes can vary in quality or can be followed in bad faith. In assessing whether a fiduciary fulfilled her duty of prudence, we ask 'whether a fiduciary employed the *appropriate* methods to investigate and determine the merits of a particular investment,' not merely whether there were any methods whatsoever." *Sacerdote et al. v. New York Univ.*, 9 F.4th 95, 111 (2d Cir. 2021) (emphasis in original).

16

70.    For purposes of this Complaint, Plaintiff has drawn reasonable inferences regarding these processes based upon several factors.

71.    Defendants' breaches of their fiduciary duties, relating to their overall decision-making, resulted in, *inter alia*, the selection (and maintenance) of the TFLIC GIO in the Plan until 2024 that wasted the assets of the Plan and the assets of participants because of unnecessary costs and underperformance.

**B.    Defendants Breached Their Fiduciary Duties by Causing the Plan to Offer the TFLIC GIO**

72.    A stable value fund is a conservative, fixed income investment vehicle that provides a relatively stable rate of return.[9]

73.    Stable value funds can be managed via guaranteed insurance contracts ("GICs"), "in which the fund manager holds or invests in a single group annuity contract issued directly to the retirement plan and the plan sponsor receives a direct guarantee of principal and accrued interest from the issuer."[10]

74.    There are generally three types of GICs: a traditional GIC (sometimes called an insurance company general account); a separate account GIC, like the TFLIC GIO; and a synthetic GIC (sometimes called a security backed investment contract).

75.    "When evaluating a[] [separate account] GIC …, the number of elements the fiduciary should consider increases and the fiduciary should give special care to the ability and experience of the fixed income manager in managing assets for a stable value program. The

---

[9] ERISA Advisory Council Report on Stable Value Funds and Retirement Security in the Current Economic Conditions, https://www.dol.gov/agencies/ebsa/about-ebsa/about-us/erisa-advisory-council/2009-stable-value-funds-and-retirement-security-in-the-current-economic-conditions.
[10] *Id.*

fiduciary must also understand and select the type of guarantee that will be in the best interest of its plan participants." [11]

76. As indicated above, the Plan was invested in a proprietary stable value fund managed by Transamerica, the TFLIC GIO. *See* Auditor's Report, attached to 2023 Form 5500 for the Plan, at 14 ("The Plan invests in a guaranteed pooled separate account, the TFLIC Guaranteed Pooled Fund, with TFLIC managed by Transamerica.").

77. There are two significant problems with the TFLIC GIO discussed below. First, the TFLIC GIO is a separate account GIC. As a separate account product, the TFLIC GIO thus has the following characteristics: generally lower crediting rates compared to traditional or general account GICs, potentially higher fees from professional money managers, and less flexibility for fund managers when choosing underlying investments.

78. The second related problem with the TFLIC GIO is that its crediting rates (*i.e.*, rates of return on investment) were/are well below what Defendants could have obtained for the Plan participants on the open market, including comparison to GICs with a lower risk-reward profile.

79. Defendants' selection of the imprudent TFLIC GIO was clearly a result of their lack of an investment review process, or at the very minimum, failure to implement a prudent investment review process.

### 1. The Plan's Inclusion of the TFLIC GIO

80. At all relevant times, Defendants exercised control over the Plan's investments, including the Plan's TFLIC GIO.

81. "TFLIC is contractually obligated to repay the principal and a specified interest rate that is guaranteed to the Plan." Auditor's Report, attached to 2023 Form 5500 for the Plan, at 14.

---

[11] https://www.dol.gov/agencies/ebsa/about-ebsa/about-us/erisa-advisory-council/2009-stable-value-funds-and-retirement-security-in-the-current-economic-conditions.

82.     A prudent fiduciary should be aware of the rates and prevailing marketplace on at

least a semi-annual basis.

83.     The Form 5500 Auditor's Notes state as follows:

> The Plan invests in a guaranteed pooled separate account, the TFLIC
> Guaranteed Pooled Fund, with TFLIC managed by Transamerica, which
> primarily invests in investment grade securities with a minimum credit
> rating of BBB or Baa3. TFLIC is contractually obligated to repay the
> principal and a specified interest rate that is guaranteed to the Plan. ***The
> crediting interest rate is declared annually with interest credited on a daily
> basis at the annual effective rate***. ***Certain Plan Sponsor events might limit
> the ability of the Plan to transact at contract value with TFLIC. Such
> events include, but are not limited to, a merger, bankruptcy, full or partial
> Plan termination, and early retirement incentive programs. Plan
> management believes the occurrence of events that would cause the Plan
> to transact at less than contract value is not probable.***
>
> &ast;&ast;&ast;
>
> These contracts meet ***the fully benefit-responsive investment contract***
> ("FBRIC") criteria and, therefore, are reported at contract value in the
> statements of net assets available for benefits. Contract value is the relevant
> measure for FBRICs because this is the amount received by participants if
> they were to initiate permitted transactions under the terms of the Plan.
> Contract value, as reported to the Plan by TFLIC and Equitable Financial
> Life, represents contributions made under the contract, plus earnings, less
> participant withdrawals, and administrative expenses.

84.     For these reasons, the TFLIC GIO's crediting rates can be compared to other

traditional GICs, commingled trust funds also called collective investment trusts, fixed annuity

contracts, and other stable value funds or GICs whose terms are: (1) fully benefit-responsive, (2)

do not permit the insurance companies to terminate the agreements before the end of the contract,

(3) whose rates are reviewed regularly, and (4) whose contracts are with creditworthy insurance

carriers. The TFLIC GIO's crediting rates can be also compared to GICs in plans whose managers

do not believe that there are any events that are likely to limit the ability of the plan to transact at

the contract value like the TFLIC GIO, therein making risk considerations equivalent. The

Comparator GICs below meet these requirements.

85.    Defendants' selection of the imprudent TFLIC GIO was clearly a result of their

lack of an investment review process, or at the very minimum, failure to implement a prudent

investment review process.

> ### 2.    There are Many GICs in the Marketplace with Competitive Crediting Rates

86.    The Plan's fiduciaries should not have selected or maintained the TFLIC GIO.

87.    The marketplace for GICs is robust with many insurance companies offering GICs

with competitive rates.

88.    Throughout the Class Period, identical or substantially identical stable value funds

with higher crediting rates, and hence lower spreads, were available to the Plan, but were not

selected by Defendants.

89.    These comparisons include:

- Auto-Owners Insurance Company Retirement Savings Plan offered a "fully benefit-responsive investment contract." Auditor's Report, attached to 2023 Form 5500 for the Auto-Owners Insurance Company Retirement Savings Plan, at 9. Further, like the TFLIC GIO, "[t]he plan administrator does not believe that the occurrence of and such value event, which would limit the Plan's ability to transact at contract value with participants, is probable." *Id*., at 10. Finally, "[t]he guaranteed investment contract does not permit the insurance company to terminate the agreement prior to the scheduled maturity date." *Id*.

- The Shands Jacksonville Retirement Plan offers a traditional guaranteed investment contract with Variable Annuity Life Insurance Company ("VALIC"). Auditor's Report, attached to the 2023 Form 5500 for the Shands Jacksonville Retirement Plan, at 12. "The contract issuer is contractually obligated to repay the principal and interest at a specified interest rate that is guaranteed to the Plan." *Id*. Like the TFLIC GIO, "[t]he crediting rate is reviewed on a quarterly basis for resetting." *Id*. Further, the company states that "no events are probable of occurring that might limit the ability of the Plan to transact at contract value." *Id*.

90.    The TFLIC GIO in the Plan had underwhelming crediting rates when compared

against stable value GICs provided by other comparable carriers for other retirement plans:

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate[12] |
|---|---|---|---|---|---|
| 2020 | Auto-Owners Insurance Company Retirement Savings Plan | 7,192 | $620,678,961 | Auto-Owners Insurance Company | 3.07% |
| | Shands Jacksonville Retirement Plan | 6,138 | $322,951,592 | VALIC | 4.33% |
| | **Centra Health Plan** | **9,434** | **$661,578,023** | **TFLIC GIO** | **0.51%** |
| 2021 | Auto-Owners Insurance Company Retirement Savings Plan | 7,480 | $711,146,156 | Auto-Owners Insurance Company | 3.02% |
| | Shands Jacksonville Retirement Plan | 6,218 | $371,794,130 | VALIC | 4.43% |
| | **Centra Health Plan** | **9,049** | **$732,407,842** | **TFLIC GIO** | **1.98%** |
| 2022 | Auto-Owners Insurance Company Retirement Savings Plan | 8,251 | $672,249,956 | Auto-Owners Insurance Company | 3.08% |
| | Shands Jacksonville Retirement Plan | 6,782 | $343,252,624 | VALIC | 4.30% |
| | **Centra Health Plan** | **12,004** | **$594,755,458** | **TFLIC GIO** | **1.92%** |
| 2023 | Auto-Owners Insurance Company Retirement Savings Plan | 8,582 | $772,874,102 | Auto-Owners Insurance Company | 3.48% |

[12] For crediting rates not identified in the plans' Form 5500s, the calculated yield is interest credited divided by the end of year balance.

| | | | | |
|---|---|---|---|---|
| Shands Jacksonville Retirement Plan | 7,204 | $396,147,444 | VALIC | 4.31% |
| **Centra Health Plan** | **10,247** | **$669,994,115** | **TFLIC GIO** | **2.22%** |

91.     Throughout the Class Period, the TFLIC GIO in the Plan underperformed the comparator funds by an average of over 56%, as demonstrated in the table below.

| Year | TFLIC GIO Rate of Return in the Plan | Comparator Average Rate of Return | TFLIC GIO Percentage of Underperformance in the Plan |
|---|---|---|---|
| 2020 | 0.51% | 3.70% | 86.22% |
| 2021 | 1.98% | 3.73% | 46.92% |
| 2022 | 1.92% | 3.69% | 47.97% |
| 2023 | 2.22% | 3.90% | 43.08% |
| Average Underperformance during Class Period | | | 56.04% |

92.     The dramatic disparities between crediting rates in all years demonstrate that any purported difference in GIC type or theoretical risk cannot be the reason for the TFLIC GIO's dismal crediting rate.

93.     Again, specific Comparator GICs used herein all had similar risk considerations based on their terms, the creditworthiness of their insurance carriers, and the fact that their plan administrators did not believe it probable that any plan or sponsor event would limit the ability of the Plan to transact at contract value. The Comparator GICs were all fully benefit-responsive and their crediting rates were all regularly reviewed in the same prevailing marketplace and economic circumstances as the TFLIC GIO.

94.     In short, because the Plan held between $500 million and $800 million in assets under management throughout the Class Period, it had considerable leverage to bargain for higher crediting rates.

95. Additionally, the Plan's TFLIC GIO underperformed other traditional guaranteed investment contracts, with similar characteristics as the TFLIC GIO, during the Class Period, as demonstrated in the table below:

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate[13] |
|---|---|---|---|---|---|
| 2020 | Baylor College of Medicine Retirement Plan | 12,905 | $1,493,377,139 | Lincoln Financial Group | 4.16% |
| | HCC Insurance Holdings Inc. 401(k) Plan | 2,711 | $428,308,461 | Massachusetts Mutual Life Insurance Company | 3.56% |
| | American United Life Progress Sharing Plan and Trust | 2,699 | $435,970,029 | American United Life Insurance Company | 3.54% |
| | **Centra Health Plan** | **9,434** | **$661,578,023** | **TFLIC GIO** | **0.51%** |
| 2021 | Baylor College of Medicine Retirement Plan | 13,391 | $1,692,013,731 | Lincoln Financial Group | 4.23% |
| | American United Life Progress Sharing Plan and Trust | 3,183 | $493,267,284 | American United Life Insurance Company | 3.87% |
| | **Centra Health Plan** | **9,049** | **$732,407,842** | **TFLIC GIO** | **1.98%** |

[13] For crediting rates not identified in the plans' Form 5500s, the calculated yield is interest credited divided by the end of year balance.

| | | | | |
|---|---|---|---|---|
| 2022 | International Imaging Materials Inc. Retirement and Investment Plan | 445 | $59,443,888 | Lincoln National Life Insurance Co. | 4.89% |
| | Baylor College of Medicine Retirement Plan | 14,036 | $1,434,738,254 | Lincoln Financial Group | 4.37% |
| | American United Life Progress Sharing Plan and Trust | 3,235 | $439,262,320 | American United Life Insurance Company | 3.90% |
| | Jackson National Life Insurance Company Defined Contribution Plan | 4,650 | $1,149,061,601 | Jackson National Life Insurance | 3.83% |
| | Trugreen Profit Sharing and Retirement Plan | 11,408 | $371,495,784 | Massachusetts Mutual Life Insurance Company | 3.67% |
| | **Centra Health Plan** | **12,004** | **$594,755,458** | **TFLIC GIO** | **1.92%** |
| 2023 | The Valley Children's Hospital Defined Contribution Retirement Plan | 4,282 | $550,230,744 | Lincoln National Life Insurance Co. | 4.57% |
| | Mattel, Inc. Personal Investment Plan | 7,427 | $1,167,576,000 | Metropolitan Tower Life Insurance Co. | 3.71% |

| | | | | |
|---|---|---|---|---|
| Pomona Valley Hospital Medical Center Retirement Savings Plan | 4,219 | $525,201,271 | Lincoln National Life Insurance Co. | 3.64% |
| **Centra Health Plan** | **10,247** | **$669,994,115** | **TFLIC GIO** | **2.22%** |

96.    A prudent fiduciary would have known that other providers of GICs offer substantially identical, better-performing stable value investments. A prudent fiduciary could have accomplished this goal by demanding higher crediting rates from insurance companies and/or by submitting requests for proposals to insurance companies and other providers of stable value investments.

97.    By selecting the TFLIC GIO with underperforming crediting rates, Defendants failed to provide participants with an option that maximized the value of their investments without needing to take on more risk.

98.    With the massive amount of assets under management in the TFLIC GIO, the losses suffered by Plan participants were devastating. Every additional expense imposed upon the participants compounds and reduces the value of their retirement savings over time. *Tibble v. Edison Int'l*, 575 U.S. 523, 525 (2015). For example, a 1% higher fee over 35 years makes a 28% difference in retirement assets at the end of a participant's career. [14]

99.    The TFLIC GIO in the Plan is a general account product that should have had a high crediting rate given its riskiness, yet it had underwhelming crediting rates when compared

---

[14] Look at 401(k) Plan Fees, UNITED STATES DEPT. OF LABOR at 2 (Sept. 2019), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource center/publications/401k-plan-fees.pdf (accessed November 19, 2025).

against GICs with similar riskiness provided by other comparable carriers for other retirement plans.

## VII.  ERISA'S PROHIBITED TRANSACTIONS PROVISIONS

100.  Restrictions under ERISA prohibit fiduciaries from causing the Plan to engage in transactions with themselves or other fiduciaries or parties-in-interest. See 29 U.S.C. § 1106(a)-(b). Section 1106(a)(1) states, in pertinent part:

> A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect-
>
> (A)  sale or exchange, or leasing, of any property between the plan and a party in interest;
>
> …
>
> (C)  furnishing of goods, services, or facilities between the plan and a party in interest;
>
> (D)  transfer to, or use by or for the benefit of a party in interest, of any assets of the plan . . . .

101.  Section 1106(b) further provides, in pertinent part:

> A fiduciary with respect to the plan shall not –
>
> (1)  deal with the assets of the plan in his own interest or for his own account,
>
> (2)  in his individual or in any other capacity act in a transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interest of the plan or the interests of its participants or beneficiaries, or
>
> (3)  receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

102.     During the Class Period, Defendants allowed Plan assets to be invested in the

TFLIC GIO that performed poorly when compared to other investments that were available, and

knowing that Transamerica, or its affiliates, were/are offering recordkeeping services to the Plan.[15]

103.     As an alternative to investing Plan assets in the TFLIC GIO, the Plan could have

invested assets in better performing investments with the same investment strategies and goals.

Defendants failed to consider this approach because it would have eliminated the compensation

earned by Transamerica.

104.     Defendants did not prudently and objectively evaluate the TFLIC GIO in the

interests of Plan participants, as prudent fiduciaries would do. Rather, Defendants selected the

TFLIC GIO in order to benefit Transamerica and its affiliates.

105.     The Plan's sizeable investment in the TFLIC GIO provided Transamerica a

substantial amount of compensation at the expense of Plan participants.

**COUNT I**
**Breach of Fiduciary Duty of Prudence**
**(against the Committee)**

106.     Plaintiff re-alleges and incorporates herein by reference all prior allegations in this

Complaint as if fully set forth herein.

107.     At all relevant times, the Committee and its members ("Prudence Defendants")

were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A),

in that it exercised discretionary authority or control over the administration and/or management

of the Plan or disposition of the Plan's assets.

---

[15] "Certain Plan investments and notes receivable from participants are managed by the Custodians. In addition, certain Plan investments are managed by Transamerica. Transamerica is the recordkeeper for these certain Plan investments. Notes receivable from participants are also considered to be party-in-interest transactions." Auditor's Report, attached to 2023 Form 5500 for the Plan, at 15.

108.    As fiduciaries of the Plan, the Prudence Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of Plan's participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

109.    The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint. Prudence Defendants did not make decisions regarding the Plan's investment lineup based solely on the merits of each investment and what was in the interest of Plan's participants. Instead, the Prudence Defendants selected and retained investment options in the Plan despite poor performance in relation to other comparable investments.

110.    As a direct and proximate result of the breaches of fiduciary duties alleged herein related to the TFLIC GIO, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns. Had Prudence Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

111.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches. In addition, Plaintiff is entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in the Prayer for Relief.

112.    The Prudence Defendants knowingly participated in each breach, knowing that such acts were a breach, and failed to make any reasonable and timely effort under the circumstances to remedy the breaches.

## COUNT II
### Failure to Adequately Monitor Other Fiduciaries
### (against the Company)

113.    Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint as if fully set forth herein.

114.    Centra Health (the "Monitoring Defendant") had the authority to appoint and remove members of the Committee, and the duty to monitor the Committee and were aware that the Committee Defendants had critical responsibilities as fiduciaries of the Plan.

115.    In light of this authority, the Monitoring Defendant had a duty to monitor the Committee to ensure that the Committee was adequately performing its fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Committee was not fulfilling those duties.

116.    The Monitoring Defendant also had a duty to ensure that the members of the Committee possessed the needed qualifications and experience to carry out their duties; had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to the Company.

117.    The Monitoring Defendant breached its fiduciary monitoring duties by, among other things, failing to monitor and evaluate the performance of the Committee or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Committee's imprudent actions and omissions.

118.    As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars in losses. Had the Monitoring Defendant complied with its fiduciary

obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

119. Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendant is liable to restore to the Plan all losses caused by their failure to adequately monitor the Committee. In addition, Plaintiff is entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

## COUNT III
## PROHIBITED TRANSACTION
### (against all Defendants)

120. Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint as if fully set forth herein.

121. Under ERISA, a plan fiduciary may not "cause the plan to engage in a transaction" if the fiduciary "knows or should know that such transaction constitutes a direct or indirect" (i) exchange of any property between the plan and a party in interest, or (ii) the furnishing of services between the plan and a party in interest. 29 U.S.C. § 1106(a)(1)(C).

122. Defendants were at all times fiduciaries to the Plan.

123. ERISA § 3(14), 29 U.S.C. § 1002(14), defines a "party in interest" to include (A) "any fiduciary . . . of such employee benefit plan;" (B) "a person providing services to such plan;" (C) "an employer any of whose employees are covered by such plan," and "(H) any employee, officer, or director of such employer."

124. Defendants caused the Plan to engage in the annuity transactions with actual or constructive knowledge that the transactions constituted a direct or indirect exchange of property between the Plan and Transamerica.

125.    Defendants also caused the Plan to engage in the annuity transactions with actual or constructive knowledge that the transaction constituted a direct or indirect furnishing of services between Transamerica and the Plan.

126.    When Defendants caused the Plan to engage in the annuity transaction, Transamerica was a party in interest, including because Transamerica, or its affiliate, was a person providing recordkeeping services to the Plan. 29 U.S.C. § 1002(14). Defendants knew of that fact when they caused the Plan to engage in the annuity transaction.

127.    These transactions occurred each time the Plan paid fees to Transamerica in connection with the Plan's investments in the TFLIC GIO and other proprietary options that paid revenue sharing to Transamerica.

128.    Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants, as fiduciaries to the Plan, are liable to restore to the Plan all losses caused by their violations of ERISA §§ 406(a)(1)(C) and (D).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

A.    A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B.    Designation of Plaintiff as Class Representative and designation of Plaintiff's counsel as Class Counsel;

C.    A Declaration that the Defendants have breached their fiduciary duties under ERISA;

D.      An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent monitoring of recordkeeping and administrative costs, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.      An order requiring the Defendants to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Defendants as necessary to effectuate said relief, and to prevent the Defendants' unjust enrichment;

F.      Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.      An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.      Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan's fiduciaries deemed to have breached their fiduciary duties;

I.      An award of pre-judgment interest;

J.      An award of costs pursuant to 29 U.S.C. § 1132(g);

     K.     An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and

the common fund doctrine; and

     L.     Such other and further relief as the Court deems equitable and just.

Dated: January 2, 2026         **COOK LEGAL SOLUTIONS**

                */s/ John C. Cook*
                John C. Cook, Esquire
                Virginia Bar Number: 38310
                3975 University Drive
                Suite 360
                Fairfax, VA  22030
                Phone:  (703) 537-0023
                Email: jcook@cooklegalsolutions.com

                Mark K. Gyandoh, Esquire
                (*Pro Hac Vice* to be requested)
                James A. Maro, Esquire
                (*Pro Hac Vice* to be requested)
                **CAPOZZI ADLER, P.C.**
                312 Old Lancaster Road
                Merion Station, PA 19066
                Email: markg@capozziadler.com
                Email: jamesm@capozziadler.com
                Phone: (610) 890-0200

                *Counsel for Plaintiff and the Putative Class*