IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
<u>LYNCHBURG DIVISION</u>

| | |
|---|---|
| ASHLEY FITCH, individually and on behalf of all others similarly situated, | ) ) ) |
| Plaintiff, | ) **NO.: 6:26-cv-00001-RSB-CKM** |
| v. | ) ) |
| CENTRA HEALTH, INC., CENTRA HEALTH, INC. RETIREMENT SAVINGS PLANNING COMMITTEE, and JOHN DOES 1-10, | ) **AMENDED[1] CLASS ACTION** ) **COMPLAINT** ) ) |
| Defendants. | ) ) |

Plaintiff, Ashley Fitch ("Plaintiff"), by and through her attorneys, on behalf of the Centra

Health Matching Tax Deferred Savings Plan (the "Plan"),[2] herself and all others similarly situated,

states and alleges as follows:

## I.    INTRODUCTION

1.    This is a class action brought pursuant to §§ 409 and 502 of the Employee

Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the

Plan's fiduciaries, Centra Health, Inc. ("Centra Health" or "Company") and the Centra Health, Inc.

Retirement Savings Planning Committee ("Committee"), during the Class Period, for breaches of

their fiduciary duties.

---

[1] Plaintiff files this Amended Class Action Complaint pursuant to the Parties' Consent Motion to Set Deadline to Respond to Complaint and Set Briefing Schedule (ECF No. 16), at 2 ("Plaintiff's Deadline to Oppose Defendants' Motion to Dismiss or to File Amended Complaint June 4, 2026").

[2] The Plan is a 403(b) tax deferred annuity plan. The Plan is a legal entity that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party. Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

2.      The Plan is a defined contribution plan, established pursuant to 29 U.S.C. § 1002(2)(A) and § 1002(34) of ERISA, that enables eligible participants to make tax-deferred contributions from their salaries to the Plan. *See* Independent Auditor's Report ("Auditor's Report"), attached to 2024 Form 5500 for the Plan, at 8 ("The Plan is a defined contribution plan established by Centra Health, Inc. (the "Plan Sponsor" or "Employer") in January 1985, which was amended and restated effective January 1, 2022.").

3.      To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B). These twin fiduciary duties are "the highest known to the law." *Tatum v. RJR Pension Investment Committee et al.*, 761 F.3d 346, 356 (4th Cir. 2014).

4.      The Department of Labor ("DOL") has also explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, "establish a prudent process for selecting investment options and service providers."[3] *See also Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1823 (2015) ("*Tibble I*") (reaffirming the ongoing fiduciary duty to monitor a plan's investment options).

5.      Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of investment options.  "Wasting beneficiaries' money is imprudent.  In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs."  Uniform Prudent Investor Act (the "UPIA"), § 7.

---

[3] *See* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Sept. 2019), at 2, available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited September 25, 2025).

6. "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (*en banc*) (quoting Restatement (Third) of Trusts, § 90, cmt. b) ("*Tibble II*").

7. The Supreme Court states that in interpreting "ERISA's duty of prudence in light of the common law of trusts" a fiduciary "has a continuing duty of some kind to monitor investments and remove imprudent ones" and a plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones. *Hughes v. Nw. Univ.*, 595 U.S. 170, 175, 142 S. Ct. 737, 741, 211 L. Ed. 2d 558 (2022).

8. Plaintiff alleges that during the putative Class Period, Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, to Plaintiff, and to the other participants of the Plan by, *inter alia*, failing to objectively and adequately review the Plan's investment portfolio, initially and on an ongoing basis, with due care to ensure that each investment option was prudent, in terms of performance.

9. At all times during the Class Period, the Plan had at least five hundred million dollars in assets under management. At the Plan's fiscal year end in 2020, the Plan had $661,578,023 in assets under management that were/are entrusted to the care of the Plan's fiduciaries. *See* 2020 Form 5500 for the Plan, Schedule H, at 2.

10. By 2024, the Plan had $669,994,115 in assets under management. *See* 2024 Form 5500 for the Plan, Schedule H, at 2.

11.     The Plan is also large in terms of the number of its participants. At the beginning of the Class Period, the Plan had 9,434 participants. *See* 2020 Form 5500 for the Plan, at 2. By 2024, the Plan had 9,110 participants. *See* 2024 Form 5500 for the Plan, at 2.

12.     With regard to the Plan's investments, Defendants breached their fiduciary duty of prudence by selecting and/or maintaining a certain guaranteed investment fund with lower crediting rates when compared to available similar or identical investments with higher crediting rates. The crediting rate is the guaranteed rate of return for the investment fund.

13.     Specifically, Defendants allowed substantial assets in the Plan to be invested in a Transamerica Financial Life Insurance Company ("Transamerica" or "TFLIC") Guaranteed Income Option ("TFLIC GIO"). The TFLIC GIO carried significantly more risk and provided a significantly lower rate of return than other comparable stable value funds that Defendants could and should have made available to Plan participants.

14.     A prudent fiduciary would not have included this underperforming investment option that also carried significantly more risk than other investment options that had similar goals, *i.e.,* preservation of investment assets.

15.     Transamerica benefited significantly from Plan participants being invested in the TFLIC GIO. A prudent fiduciary who adequately monitored the Plan's investments and placed the interests of participants in the Plan above all would have recognized that the TFLIC GIO was benefiting Transamerica at the expense of the participants in the Plan. The investments in the TFLIC GIO were held and invested by Transamerica, which kept the spread (the difference between the amount it earned on the investment and the amount it paid to the Plan's participants). The crediting rates that Transamerica provided to the Plan were and are so low that Transamerica reaped a windfall on the spread.

16.    Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duty of prudence, in violation of 29 U.S.C. § 1104. Their actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

17.    Based on this conduct, Plaintiff asserts claims against Defendants for breach of the fiduciary duty of prudence (Count I) and failure to monitor fiduciaries (Count II).

## II.    JURISDICTION AND VENUE

18.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq.*

19.    This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

20.    Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## III.    PARTIES

### Plaintiff

21.    Plaintiff, Ashley Fitch ("Fitch"), resides in Lynchburg, Virginia. During her employment, Plaintiff Fitch participated in the Plan. Ms. Fitch invested in the TFLIC GIO in the

Plan and suffered injury to her Plan account due to the significant underperformance of the TFLIC GIO.

22.     Plaintiff has standing to bring this action on behalf of the Plan because she participated in the Plan and was injured by Defendants' unlawful conduct.  Plaintiff is entitled to receive benefits in the amount of the difference between the value of her account currently, or as of the time her account was distributed, and what her account is or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

23.     Plaintiff did not have knowledge of all material facts (including, among other things, the investment alternatives that are comparable to the investments offered within the Plan, comparisons of the costs and investment performance of Plan investments versus available alternatives within similarly-sized plans) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

**Defendants**

**Company Defendant**

24.     Centra Health, Inc. is the Plan Sponsor and a named fiduciary of the Plan with a principal place of business at 1920 Atherholt Road, Lynchburg, Virginia. *See* the 2023 Form 5500 at 1. Centra "is a regional nonprofit healthcare system based in Lynchburg, Virginia, serving over 500,000 people as the dominant provider of critical medical services in central and southern Virginia."[4]

25.     "The Plan is administered by the Plan Sponsor, which serves without compensation. The Plan Administrator has the overall responsibility and authority as the named

---

[4]  https://www.centrahealth.com/about-centra last accessed on June 2, 2026.

fiduciary to manage and control the operations and administration of the Plan and may designate one or more individuals to perform those responsibilities." *See* 2024 Form 2200 for the Plan, at 8.

26.    Centra Health appointed the Retirement Savings Planning Committee to, among other things, ensure that the investments available to Plan participants are appropriate, had no more expense than reasonable and performed well as compared to their peers. As will be discussed below, the Committee fell well short of these fiduciary goals. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

27.    Accordingly, Centra Health during the putative Class Period is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because it had a duty to monitor the actions of the Committee.

28.    For the foregoing reasons, the Company is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

**Committee Defendants**

29.    The Centra Health, Inc. Retirement Savings Planning Committee and its members exercise discretionary authority over management or disposition of plan assets. *See* Retirement Savings Planning Committee Charter ("Committee Charter"), at 2 ("The primary purpose of the Retirement Plan Committee is to oversee the investment portfolio and service providers to the 'Plan'. The Retirement Plan Committee also has general responsibility and oversight for the administration and compliance of the 'Plan'.").

30.    Specifically, the Committee, "shall have the following responsibilities: 1. Supervise the investment of assets of the plan in accordance with ERISA.; 2. Establish an Investment Policy Statement for the 'Plan' that provides a methodology for the ongoing retention and oversight of

the 'Plan' investments.; 3. Review and approve and/or replace investments in the 'Plan' using the guidelines set out in the Investment Policy Statement. … ." Committee Charter, at 2.

31.    The Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of Plan assets.

32.    The Committee and unnamed members of the Committee during the Class Period (referred to herein as John Does 1-10), are collectively referred to herein as the "Committee Defendants."

## IV.    CLASS ACTION ALLEGATIONS[5]

33.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of herself and the following proposed class ("Class"):[6]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Centra Health Matching Tax Deferred Savings Plan, at any time between September 28, 2020 through the December 31, 2024[7] (the "Class Period").

---

[5] Although this is a proposed class action, the allegations in this complaint are alternatively pled in derivative fashion on behalf of the Plan because class certification is not necessarily required for Plaintiff to prosecute claims on behalf of the Plan and all participants. *See, e.g.*, *In re: Wilmington Trust Corp.,* 2013 WL 4757843, at *3 (D. Del. Sept. 4, 2013) (granting plaintiffs' motion to proceed derivatively on behalf of all plan participants without class certification, because of the nature of such claims). ERISA Section 502(a), 29 U.S.C. § 1132(a), authorizes pension plan participants to bring suit on behalf of a plan to recover losses to a plan.

[6] Plaintiff reserves the right to propose other or additional classes or subclasses in the motion for class certification or subsequent pleadings in this action.

[7] The end of the Class Period is subject to change. At some point in 2024, Defendants removed the TFLIC GIO as an investment fund available to Plan participants, which further supports Plaintiff's argument that the TFLIC GIO should never have been offered as an investment option for Plan participants.

34.     The members of the Class are so numerous that joinder of all members is impractical. The 2024 Form 5500 lists 9,110 Plan "participants with account balances as of the end of the plan year." *See* 2024 Form 5500, at 2.

35.     Plaintiff's claims are typical of the claims of the members of the Class. Like other Class members, Plaintiff participated in the Plan and has suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated the Plaintiff consistently with other Class members and managed the Plan as a single entity. Plaintiff's claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

36.     There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

A.     Whether Defendants are/were fiduciaries of the Plan;

B.     Whether Defendants breached their fiduciary duties of prudence by engaging in the conduct described herein;

C.     Whether the Company failed to adequately monitor the Committee and other fiduciaries to ensure the Plan was being managed in compliance with ERISA;

D.     The proper form of equitable and injunctive relief; and

E.     The proper measure of monetary relief.

37.     Plaintiff will fairly and adequately represent the Class and has retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiff has no interests antagonistic to those of other members of the Class. Plaintiff is committed to the vigorous

9

prosecution of this action and anticipates no difficulty in the management of this litigation as a class action.

38.     This action may be properly certified under Rule 23(b)(1). Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

39.     In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## V.     THE PLAN

40.     The Company established the Plan in January 1985, for the benefit of its employees. *See* Auditor's Report attached to 2024 Form 5500 for the Plan, at 8.

41.     The Plan, "was amended and restated effective January 1, 2022." *Id*.

42.     The Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants

10

which may be allocated to such participant's account. Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account.

43.    Effective September 28, 2020, the TFLIC GIO was an investment fund available in the Plan. *See* Amendment No. 9 to the Transamerica Retirement Solutions, LLC Pension Services Agreement ("This Agreement is hereby amended as follows: I. Effective September 28, 2020 … 2. By the addition of the following Investment Option(s) to the Investment Options Schedule …: Transamerica Guaranteed Investment Option.").

44.    At the end of 2020, $69,443,501 in Plan assets were invested in the TFLIC GIO. *See* Schedule H, Line 4i – Schedule of Assets (Held at End of Year), attached to 2019 Form 5500 for the Plan, at 15.

45.    At the end of 2023, over $64 million in Plan assets were invested in the TFLIC GIO. *See* Schedule H, Line 4i – Schedule of Assets (Held at End of Year), attached to 2023 Form 5500 for the Plan, at 19.

46.    The chart below demonstrates the amount of Plan assets invested in the TFLIC GIO during the Class Period.

| Plan Year | Plan Assets in TFLIC GIO | Total Amount of Plan Assets | Plan Assets in TFLIC GIO as Percentage of Total Plan Assets |
|---|---|---|---|
| 2020 | $69,443,501 | $661,578,023 | 10.50% |
| 2021 | $67,735,735 | $732,407,842 | 9.25% |
| 2022 | $68,798,562 | $594,755,458 | 11.57% |
| 2023 | $64,698,240 | $669,994,115 | 9.66% |

*Eligibility*

47.    In general, the Plan covers all employees of Centra Health on their first day of employment. *See* Auditor's Report attached to 2023 Form 5500 for the Plan, at 8 ("Employees are eligible to participate in the Plan on the first day of employment with the Plan Sponsor.").

11

*Contributions*

48.    There are several types of contributions that can be added to a participant's account. *See* Auditor's Report attached to 2023 Form 5500 for the Plan, at 9 ("For the year ended December 31, 2023, participants may contribute up to $22,500 of pre-tax annual compensation subject to certain Internal Revenue Code ("IRC") limitations. Once eligible, participants may also contribute amounts representing distributions from other qualified retirement plans, 403(b) tax sheltered annuity plans, governmental 457(b) plans, and traditional individual retirement accounts.").

49.    The Plan also provides "a Plan Sponsor matching contribution of 100% of each eligible participant's contributions up to 3% of compensation during the Plan year. In addition, certain participants who have turned 50 and achieved 15 years of service with the Plan Sponsor prior to December 31, 2010, are eligible for an additional non-elective contribution equal to 2% of the participant's eligible compensation. The Plan also provides for an additional discretionary non-elective contribution." *Id*.

50.    Like other companies that sponsor 401(k) plans for their employees, Centra Health enjoys both direct and indirect benefits by providing matching contributions to Plan participants. Employers are generally permitted to take tax deductions for their contributions to 401(k) plans at the time when the contributions are made. *See generally*, https://www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview.

51.    Centra Health also benefits in other ways from the Plan's matching program. It is well-known that "[o]ffering retirement plans can help in employers' efforts to attract new employees and reduce turnover." *See* https://www.paychex.com/articles/employee-benefits/employer-matching-401k-benefits.

52.     Given the size of the Plan, Centra Health likely enjoyed significant tax and cost savings from offering a match.

## VI.    THE TOTALITY OF THE CIRCUMSTANCES DEMONSTRATES THAT DEFENDANTS FAILED TO ADMINISTER THE PLAN IN A PRUDENT MANNER

### A.    The Stable Value Fund in the Plan

53.     As indicated above, the Plan was invested in the TFLIC GIO, a proprietary stable value fund managed by Transamerica.

54.     A stable value fund is a conservative, fixed income investment vehicle that provides a relatively stable rate of return.[8]

55.     Stable value funds can be managed via guaranteed insurance contracts ("GICs"), "in which the fund manager holds or invests in a single group annuity contract issued directly to the retirement plan and the plan sponsor receives a direct guarantee of principal and accrued interest from the issuer."[9]

56.     The TFLIC GIO is thus a contract and not a mutual fund investment. To be sure, there are important differences between a mutual fund and stable value fund. Unlike mutual funds, stable value funds are defined by their predictability, they offer a set return on investment irrespective of management style, and their associated risk level is a creature of their structural design rather than their investment strategy.

---

[8] ERISA Advisory Council Report on Stable Value Funds and Retirement Security in the Current Economic Conditions, https://www.dol.gov/agencies/ebsa/about-ebsa/about-us/erisa-advisory-council/2009-stable-value-funds-and-retirement-security-in-the-current-economic-conditions.

[9] *Id.*

57.    There are generally three types of GICs: a traditional GIC (sometimes called an insurance company general account), like TFLIC GIO; a separate account GIC; and a synthetic GIC (sometimes called a security backed investment contract).

58.    The TFLIC GIO was fully benefit responsive, which means that the participants can initiate transactions, such as withdrawals, at book value without adjustment. Further, the TFLIC GIO's contract was with a creditworthy insurance carrier that could not be terminated prior to the scheduled maturity date. The TFLIC GIO managers do not believe that there were any events that were likely to limit the ability of the plan to transact at the contract value.

59.    Given the substantial similarities of all stable value funds as described herein, the TFLIC GIO's crediting rates can be compared to other stable value funds, including traditional GICs, whose terms are, *inter alia*: (1) fully benefit-responsive; (2) whose contracts are with creditworthy insurance carriers; and (3) whose insurance company cannot terminate the agreement prior to the scheduled maturity date. The TFLIC GIO's crediting rates can also be compared to GICs in plans whose managers do not believe that there are any events that are likely to limit the ability of the plan to transact at the contract value like the TFLIC GIO, therein making stated risk considerations equivalent.

60.    As discussed below, Defendants' selection of the imprudent TFLIC GIO was clearly a result of their lack of an investment review process, or at the very minimum, failure to implement a prudent investment review process.

**B.    Defendants Failed ERISA's High Standards Regarding Process and Methodology of Evaluating The FLIC GIO**

61.    As described in the "Parties" section above, Defendants were fiduciaries of the Plan.

14

62. ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted). In addition to a duty to select prudent investments, under ERISA, a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble I*, 135 S. Ct. at 1828; *see also Hughes*, 142 S. Ct. at 741.

63. As stated by the DOL: ERISA "requires plan fiduciaries, when selecting and monitoring service providers and plan investments, to act prudently and solely in the interest of the plan's participants and beneficiaries. Responsible plan fiduciaries also must ensure that arrangements with their service providers are 'reasonable' and that only 'reasonable' compensation is paid for services. …" DOL 408(b)(2) Regulation Fact Sheet.

64. The duty "…to act solely in the best interest of participants has been a key tenet of ERISA since its passage." "Best Practices for Plan Fiduciaries," at 36, published by Vanguard, 2019.[10]

65. Acting in the sole interest of plan participants is all encompassing. A fiduciary must monitor all investment options in a 401(k) plan as a prudent investment professional. *See* the U.S. Department of Labor, Employee Benefits Security Administration (EBSA)'s "Meeting Your Fiduciary Responsibilities," at 2 ("The duty to act prudently is one of a fiduciary's central responsibilities under ERISA. It requires expertise in a variety of areas, such as investments."), available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities.pdf.

---

[10] Available at https://institutional.vanguard.com/iam/pdf/FBPBK.pdf?cbdForceDomain.

66.     Reasonable prudent monitoring of stable value funds like GICs requires fiduciaries to evaluate the terms and conditions of the GIC contracts, research the relevant market, and test the market, by, among other things, issuing requests for information and proposals from competing GIC providers.

67.     In the case of stable value options, there is not one commonly accepted and publicly available index in which to compare GICs.

68.     Accordingly, the measurement of stable value funds, and specifically the TFLIC GIO, against prudently managed alternative stable value funds is critical given that these alternatives represent other investments available to a plan, which may increase the likelihood that participants reach/live their preferred lifestyle in retirement.

69.     Indeed, "peer comparison is one of the most widely used and accepted methods of equity analysis used by professional analysts, individual investors, and professionals."[11]

70.     Whether a plan fiduciary enlists the assistance of an investment manager, consultant, or advisor, the plan's fiduciaries are not relieved of fiduciary liability for selecting and monitoring the plan's investment options.

71.     It is black letter law that a fiduciary's duty to conduct an "independent investigation into the merits of a particular investment," is the "most basic of ERISA's investment fiduciary duties." *In re Unisys Savings Plan Litigation*, 74 F.3d 420, 435 (3d Circ. 1996). *Hughes*, 142 S. Ct. at 738 (noting ERISA fiduciaries are required to "conduct their own independent evaluation to determine which investments may by prudently included in the plan's menu of options.").

72.     It may also indicate a lack of adequate care and attention to ignore sound advice provided by investment advisors.

---

[11] *See* https://www.investopedia.com/terms/p/peer-group.asp (last visited June 1, 2026).

73.     To the extent plan fiduciaries have adopted an investment policy statement, those fiduciaries "must comply with the plan's written statements of investment policy, insofar as those written statements are consistent with the provisions of ERISA." *Lauderdale v. NFP Retirement o, Inc.*, 2022 WL 17260510, at * 10 (S.D. Cal. Nov. 17, 2022). That is, the investment policy statement must be written with the sole interest of the plan participant in mind.

74.     Plaintiff did not have and does not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for selecting, monitoring, and removing the Plan's investments because this information is solely within the possession of Defendants prior to discovery. *See Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.").

75.     In fact, in an attempt to discover the details of the Plan's mismanagement, Plaintiff first wrote to the Plan administrator on December 19, 2022 to request, among other things, "all written instruments" governing or pertaining to the Plan, including "Investment Policy Statements, and amendments, exhibits, or appendices thereto[,]" "Investment Management Contracts, or other instruments under which the Plan was established or operated, and all amendments, exhibits, or appendices thereto," and as well as any committee's meeting minutes. This request was made pursuant to Section 104(b)(4) of ERISA.

76.     By correspondence dated January 18, 2023 and March 15, 2023, the Plan administrator provided select, but not all, meeting minutes. However, the Plan administrator did not produce any investment policy statement(s).

17

77.    Reviewing meeting minutes and investment policy statements, when they exist, is the bare minimum needed to peek into a fiduciary's monitoring process. But in most cases even that is not sufficient. For, "[w]hile the absence of a deliberative process may be enough to demonstrate imprudence, the presence of a deliberative process does not … suffice in every case to demonstrate prudence.  Deliberative processes can vary in quality or can be followed in bad faith. In assessing whether a fiduciary fulfilled her duty of prudence, we ask 'whether a fiduciary employed the *appropriate* methods to investigate and determine the merits of a particular investment,' not merely whether there were any methods whatsoever." *Sacerdote et al. v. New York Univ.*, 9 F.4th 95, 111 (2d Cir. 2021) (emphasis in original).

78.    For purposes of this Complaint, Plaintiff has drawn reasonable inferences regarding these processes based upon several factors.

79.    Defendants' breaches of their fiduciary duties, relating to their overall decision-making, resulted in, *inter alia*, the selection (and maintenance) of the TFLIC GIO in the Plan until 2024 that wasted the assets of the Plan and the assets of participants because of unnecessary costs and underperformance.

**C.    The TFLIC GIO Materially Underperformed Relative to Comparator Stable Value Fund GICs**

80.    Selecting and monitoring stable value products requires researching the relevant market, and testing the market by, among other things, issuing requests for proposals to solicit bid proposals. That is because stable value products are substantially similar in that their stated goal is to preserve income, *i.e.,* all stable value products have nearly identical investment strategies.

81.    Accordingly, it is a best practice for plans with substantial participant investments in stable value products to solicit competitive bids to initially select a stable value product, monitor

18

opportunities in the entire marketplace on an ongoing basis, and periodically solicit competitive bids.

82.     The Plan's fiduciaries took no such steps. Had Defendants continually monitored and evaluated the TFLIC GIO's rates compared to market rates, they would have known, if they did not actually know, that the investment underperformed year after year for the entire Class Period compared to other comparable stable value funds.

83.     If Defendants had adopted and implemented a prudent process or policy, they could easily have selected or switched to another stable value fund with a proven track record of competitive returns at the very least prior to 2024.[12]

84.     As stated above, the TFLIC GIO's crediting rates can be compared to other traditional GICs, commingled trust funds also called collective investment trusts, fixed annuity contracts, and other stable value funds or GICs whose terms are, *inter alia*,: (1) fully benefit-responsive, (2) whose contracts are with creditworthy insurance carriers, and (3) whose insurance company cannot terminate the agreement prior to the scheduled maturity date.

85.     Additionally, the TFLIC GIO's crediting rates can be also compared to GICs in plans whose managers do not believe that there are any events that are likely to limit the ability of the plan to transact at the contract value like the TFLIC GIO, therein making risk considerations equivalent.

86.     And finally, comparisons to other stable value funds is appropriate because stable value funds share similar investment strategies.

---

[12] Upon information and belief, after 2023, the Plan selected another stable value fund. To the extent this is confirmed through discovery, this action was too little too late as damages to the Plan participants was already baked in by the end of 2023. Moreover, replacement of the TFLIC GIO is meaningless if replaced by another poorly performing stable value fund compared to the comparator stable value funds alleged herein.

87.     The Comparator Funds below meet these requirements. Importantly, the TFLIC GIO had chronically underperforming crediting rates when compared against stable value GICs provided by other comparable carriers for other retirement plans.

88.     Defendants' selection of the imprudent TFLIC GIO was clearly a result of their lack of an investment review process, or at the very minimum, failure to implement a prudent investment review process.

### 1.     There are Many GICs in the Marketplace with Competitive Crediting Rates

89.     The TFLIC GIO in the Plan is a general account product that should have had a high crediting rate given its riskiness, yet it had underwhelming crediting rates when compared against GICs with similar or lower riskiness provided by other comparable carriers for other retirement plans.

90.     The marketplace for GICs is robust with many insurance companies offering GICs with competitive rates.

91.     Throughout the Class Period, identical or substantially identical stable value funds with higher crediting rates were available to the Plan, but were not selected by Defendants.

92.     As representative examples, these comparisons include:

- Auto-Owners Life Insurance Company ("AOLIC") provided a "fully benefit-responsive investment contract" for the Auto-Owners Insurance Company Retirement Savings Plan. Auditor's Report, attached to 2023 Form 5500 for the Auto-Owners Insurance Company Retirement Savings Plan, at 9. Further, like the TFLIC GIO, "[t]he plan administrator does not believe that the occurrence of and such value event, which would limit the Plan's ability to transact at contract value with participants, is probable." *Id*., at 10. Finally, "[t]he guaranteed investment contract does not permit the insurance company to terminate the agreement prior to the scheduled maturity date." *Id*.

- The Ameritas 401(k) Retirement Plan offered a "fully benefit-responsive" unallocated insurance contract with Ameritas Life Insurance Corp. Auditor's Report attached to the 2024 Form 5500 for the Ameritas 401(k) Retirement Plan,

20

at 10. "Interest rate guarantees of the unallocated insurance contract are backed by assets held by the Company." *Id*. Like the TFLIC GIO, "[u]nder no event may the Company terminate this contract and settle at an amount different from contract value." *Id*.

- The Standard 401(k) Plan offered "a fully benefit-responsive investment contract ("FBRIC") with Standard [Insurance Company]." Auditor's Report attached to 2024 Form 5500 for The Standard 401(k) Plan. "The Plan's ability to receive amounts due is dependent on the issuer's ability to meet its financial obligations." *Id*. Like the TFLIC GIO, "The FBRIC does not permit the insurance company to terminate the agreements prior to the scheduled maturity date" and "[n]o events are probable of occurring that might limit the Plan's ability to transact at contract value with the contract issuer and that also would limit the ability of the Plan to transact at contract value with the participants." *Id*.

- The Ford Foundation Retirement Plan offered "a guaranteed fixed annuity contract" that was "fully and unconditionally guaranteed by TIAA." Auditor's Report, attached to 2024 Form 5500 for the Ford Foundation Retirement Plan, at 11. "The participant's principal, plus a specified minimum rate of interest, are guaranteed by TIAA's claims-paying ability." *Id*., at 12.

- The Transamerica 401(k) Retirement Savings Plan offered "a fully benefit-responsive GIC with TFLIC, where TFLIC maintains the contributions in a general account." Auditor's Report, attached to 2024 Form 5500 for the Transamerica 401(k) Retirement Savings Plan, at 8. "The GIC issuer contractually must repay the principal and a specified interest rate that the issuer guarantees to the Plan." *Id*. Like the TFLIC GIO, "[t]he Company does not believe that the occurrence of any such events that would limit the Plan's ability to transact at contract value with participants is probable." *Id*., at 9.

93.     Collectively, the GICs in the Auto-Owners Insurance Company Retirement Savings Plan, the Ameritas 401(k) Retirement Plan, The Standard 401(k) Plan, the Ford Foundation Retirement Plan, and the Transamerica 401(k) Retirement Savings Plan are referred to as the "Comparator Funds."

94.     The TFLIC GIO's consistent underperformance compared to objective criteria, including the Comparator Funds, was detrimental to Plan participants. Because of the compounding losses or gains of investments, prudent fiduciaries will compare relative performance of comparable investments, rather than just absolute performance. This is because

21

even a "1%" difference causes exponential losses beyond what occurs "each year" because of the "lost investment opportunity" that a better performing fund "would have earned over time." *Tibble II*, 843 F.3d at 1198.

95.     Because of the compounding losses or gains of investments, prudent fiduciaries will compare relative performance of comparable investments, rather than just absolute performance. This is because even a "1%" difference causes exponential losses beyond what occurs "each year" because of the "lost investment opportunity" that a better performing fund "would have earned over time." *Tibble II*, 843 F.3d at 1198.

**2.      The TFLIC GIO performed poorly when compared to the Comparator Funds at the Start of the Class Period**

**a.      The Comparator Funds Outperformed the TFLIC GIO in 2020**

96.     The TFLIC GIO has underperformed the Comparator Funds since 2020.

97.     In 2020, the Comparator Funds performed much better than the TFLIC GIO. Specifically, the Comparator Funds had an average calculated crediting rate of 3.42%. The crediting rate for the TFLIC GIO in the Plan was a dismal 0.51% in 2020.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| 2020 | Auto-Owners Insurance Company Retirement Savings Plan | 7,192 | $620,678,961 | Auto-Owners Insurance Company | 3.07% |
| | Ameritas 401(k) Retirement Plan | 3,553 | $708,127,755 | Ameritas Life Insurance | 3.48% |
| | The Standard 401(k) Plan | 4,554 | $920,504,787 | Standard Insurance | 3.23% |
| | Ford Foundation Retirement Plan | 228 | $292,861,235 | TIAA-CREF | 4.04% |

| | | | | | |
|---|---|---|---|---|---|
| | Transamerica 401(k) Retirement Savings Plan | 14,722 | $2,347,162,318 | Transamerica Financial Life | 3.27% |
| | **Centra Health Plan** | **9,434** | **$661,578,023** | **Transamerica Financial Life** | **0.51%** |

98.     In 2020, the TFLIC GIO underperformed the Comparator Funds by 85.09%.

99.     Additionally, the TFLIC GIO underperformed other GICs with similar characteristics as the TFLIC GIO in 2020, as demonstrated in the table below.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| 2020 | Baylor College of Medicine Retirement Plan | 12,905 | $1,493,377,139 | Lincoln Financial Group | 4.16% |
| | Alina 401(k) Retirement Savings Plan | 32,203 | $2,690,046,457 | Brighthouse Life Insurance Company | 3.72% |
| | HCC Insurance Holdings Inc. 401(k) Plan | 2,711 | $428,308,461 | Massachusetts Mutual Life Insurance Company | 3.56% |
| | American United Life Progress Sharing Plan and Trust | 2,699 | $435,970,029 | American United Life Insurance Company | 3.54% |
| | **Centra Health Plan** | **9,434** | **$661,578,023** | **Transamerica Financial Life** | **0.51%** |

**b**.     **The TFLIC GIO's Poor Performance Continued through 2021**

100.     As demonstrated in the table below, the TFLIC GIO's poor performance continued through 2021.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| 2021 | Auto-Owners Insurance Company Retirement Savings Plan | 7,480 | $711,146,156 | Auto-Owners Insurance Company | 3.02% |
| | Ameritas 401(k) Retirement Plan | 3,537 | $779,870,323 | Ameritas Life Insurance | 3.43% |
| | The Standard 401(k) Plan | 4,674 | $1,062,535,266 | Standard Insurance | 3.29% |
| | Ford Foundation Retirement Plan | 198 | $309,155,677 | TIAA-CREF | 3.56% |
| | Transamerica 401(k) Retirement Savings Plan | 14,065 | $2,563,127,214 | Transamerica Financial Life | 3.32% |
| | **Centra Health Plan** | **9,049** | **$732,407,842** | **Transamerica Financial Life** | **1.98%** |

101.     In 2021, the TFLIC GIO underperformed the Comparator Funds by 40.36%.

102.     Additionally, the TFLIC GIO also underperformed other GICs with similar characteristics as the TFLIC GIO in 2021, as demonstrated in the table below.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| 2021 | Gemba Group Annuity Plan | 969 | $118,565,852 | National Ohio Financial Services | 4.97% |
| | Baylor College of Medicine Retirement Plan | 13,391 | $1,692,013,731 | Lincoln Financial Group | 4.23% |
| | Holzer Health System 401(a) Profit Sharing Plan | 2,017 | $203,815,263 | American United Life Insurance Company | 4.02% |

| | | No. of Particip ants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| | American United Life Progress Sharing Plan and Trust | 3,183 | $493,267,284 | American United Life Insurance Company | 3.87% |
| | Gemba Group Annuity Plan | 969 | $118,565,852 | Principal Life Insurance Company | 3.84% |
| | **Centra Health Plan** | **9,049** | **$732,407,842** | **Transamerica Financial Life** | **1.98%** |

**c.      The Comparator Funds Outperformed the TFLIC GIO in 2022**

103.      As demonstrated in the table below, the TFLIC GIO's poor performance continued through 2022.

| Year | Plan Name | No. of Particip ants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| 2022 | Auto-Owners Insurance Company Retirement Savings Plan | 8,251 | $672,249,956 | Auto-Owners Insurance Company | 3.08% |
| | Ameritas 401(k) Retirement Plan | 3,779 | $636,210,578 | Ameritas Life Insurance | 3.30% |
| | The Standard 401(k) Plan | 4,832 | $931,024,946 | Standard Insurance | 3.22% |
| | Ford Foundation Retirement Plan | 174 | $261,575,612 | TIAA-CREF | 4.21% |
| | Transamerica 401(k) Retirement Savings Plan | 14,280 | $2,116,061,137 | Transamerica Financial Life | 3.23% |
| | **Centra Health Plan** | **12,004** | **$594,755,458** | **TFLIC GIO** | **1.92%** |

104.      In 2022, the TFLIC GIO underperformed the Comparator Funds by 43.70%.

105.      Additionally, the TFLIC GIO also underperformed other GICs with similar characteristics as the TFLIC GIO in 2022, as demonstrated in the table below.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| 2022 | International Imaging Materials Inc. Retirement and Investment Plan | 445 | $59,443,888 | Lincoln National Life Insurance Co. | 4.89% |
| | Baylor College of Medicine Retirement Plan | 14,036 | $1,434,738,254 | Lincoln Financial Group | 4.37% |
| | American United Life Progress Sharing Plan and Trust | 3,235 | $439,262,320 | American United Life Insurance Company | 3.90% |
| | Jackson National Life Insurance Company Defined Contribution Plan | 4,650 | $1,149,061,601 | Jackson National Life Insurance | 3.83% |
| | Allina 401(k) Retirement Savings Plan | 34,554 | $2,678,277,538 | Brighthouse Life Insurance Company | 3.69% |
| | Trugreen Profit Sharing and Retirement Plan | 11,408 | $371,495,784 | Massachusetts Mutual Life Insurance Company | 3.67% |
| | **Centra Health Plan** | **12,004** | **$594,755,458** | **TFLIC GIO** | **1.92%** |

       **d.**       **The TFLIC GIO's Poor Performance Continued through 2023**

106.    As demonstrated in the table below, the TFLIC GIO's poor performance continued through 2023.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| 2023 | Auto-Owners Insurance Company Retirement Savings Plan | 8,582 | $772,874,102 | Auto-Owners Insurance Company | 3.48% |

| | Ameritas 401(k) Retirement Plan | 3,686 | $741,588,807 | Ameritas Life Insurance | 3.66% |
|---|---|---|---|---|---|
| | The Standard 401(k) Plan | 5,371 | $1,129,069,194 | Standard Insurance | 3.64% |
| | Ford Foundation Retirement Plan | 126 | $287,214,199 | TIAA-CREF | 4.76% |
| | Transamerica 401(k) Retirement Savings Plan | 14,168 | $2,425,600,114 | Transamerica Financial Life | 3.79% |
| | **Centra Health Plan** | **10,247** | **$669,994,115** | **TFLIC GIO** | **2.22%** |

107.    In 2023, the TFLIC GIO underperformed the Comparator Funds by 42.64%.

108.    Additionally, the TFLIC GIO also underperformed other GICs with similar characteristics as the TFLIC GIO in 2023, as demonstrated in the table below.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| 2023 | Valley Hospital Retirement Defined Contribution Plan | 4,282 | $550,230,744 | Lincoln National Life Insurance Co. | 4.57% |
| | Mattel, Inc. Personal Investment Plan | 7,427 | $1,167,576,000 | Metropolitan Tower Life Insurance Co. | 3.71% |
| | Pomona Valley Hospital Medical Center Retirement Savings Plan | 4,219 | $525,201,271 | Lincoln National Life Insurance Co. | 3.64% |
| | Auto-Owners Insurance Company Retirement Savings Plan | 8,582 | $772,874,102 | Auto-Owners Life Insurance Company | 3.48% |
| | **Centra Health Plan** | **10,247** | **$669,994,115** | **TFLIC GIO** | **2.22%** |

27

109. Throughout the Class Period, the TFLIC GIO in the Plan underperformed the Comparator Funds by over 52 percent, as demonstrated in the table below.

| Year | TFLIC GIO Rate of Return in the Plan | Comparator Average Rate of Return | TFLIC GIO Percentage of Underperformance in the Plan |
|---|---|---|---|
| 2020 | 0.51% | 3.42% | 85.09% |
| 2021 | 1.98% | 3.32% | 40.36% |
| 2022 | 1.92% | 3.41% | 43.70% |
| 2023 | 2.22% | 3.87% | 42.64% |
| **Average Underperformance during Class Period** | | | **52.94%** |

110. The dramatic disparities between crediting rates in all years demonstrate that any purported difference in GIC type or theoretical risk cannot be the reason for the TFLIC GIO's dismal crediting rate.

111. Again, the specific Comparator Funds used herein had similar risk considerations based on its terms and the creditworthiness of its insurance carriers. The Comparator Funds were fully benefit-responsive and their crediting rates were regularly reviewed in the same prevailing marketplace and economic circumstances as the TFLIC GIO.

112. In short, because the Plan held between $600 million and $800 million in assets under management throughout the Class Period, it had considerable leverage to bargain for higher crediting rates.

113. A prudent fiduciary would have known that other providers of fixed annuities offer substantially identical, better-performing stable value investments. A prudent fiduciary could have accomplished this goal by demanding higher crediting rates and/or by submitting requests for proposals to Transamerica and other providers of stable value investments.

### 3. The TFLIC GIO performed poorly when compared globally to all stable value funds

114. There is one more noteworthy benchmark to consider. According to an article by the Stable Value Institute of America ("SVIA"), "[t]he Stable Value Investment Association recently examined 135,000 retirement savings plans serving approximately 42 million participants. From January 2010 through December 2019, stable value assets in [retirement] plans grew at a compound annual rate of 4.1%."[13]

115. Comparatively, as noted above, the TFLIC GIO had an average return of 1.66% from 2020 through 2023. The Comparator Funds had an average 3.51% return rate. Thus, the average return for the Comparator GICs for the Class Period is a relatively conservative return compared to the 4.1% returns observed by the SVIA. Yet, even while conservative, the Comparator GIC's average returns were higher than the TFLIC GIO's average returns.

116. The TFLIC GIO had an average return of 1.66% from during the Class Period.  This was over 59% less than the 4.1% returns the SVIA cited for 42 million participants.

***

117. By selecting the TFLIC GIO with underperforming crediting rates, Defendants failed to act in the best interest of Plan participants to maximize the value of their investments.

118. With the significant amount of assets under management in the TFLIC GIO, comprising 9% to 11% of Plan assets from 2020 to 2023, the losses suffered by Plan participants were devastating, costing the Plan and its participants millions of dollars. Every additional expense imposed upon the participants compounds and reduces the value of their retirement savings over

---

[13] *See* "Retirement Plans and Stable Value: By the Numbers," updated July 21, 2025, available at https://www.stablevalue.org/retirement-plans-and-stable-value-by-the-numbers/ (last visited June 1, 2026)

time. *Tibble v. Edison Int'l*, 575 U.S. 523, 525 (2015). For example, a 1% higher fee over 35 years makes a 28% difference in retirement assets at the end of a participant's career.[14]

119.    In sum, the TFLIC GIO in the Plan is a general account product that should have had a high crediting rate given its riskiness, yet it had underwhelming crediting rates when compared against GICs with similar riskiness provided by other comparable carriers for other retirement plans.

120.    Given the Plan's substantial stable value investment assets, reasonably prudent monitoring of the TFLIC GIO required Defendants to evaluate the terms and conditions of the GIC contract, research the relevant market, and test the market by, among other things, issuing requests for information and proposals from competing stable value providers.  All of which they failed to do.

**COUNT I**
**Breach of Fiduciary Duty of Prudence**
**(against the Committee)**

121.    Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint as if fully set forth herein.

122.    At all relevant times, the Committee and its members ("Prudence Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that it exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

123.    As fiduciaries of the Plan, the Prudence Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing

---

[14] Look at 401(k) Plan Fees, UNITED STATES DEPT. OF LABOR at 2 (Sept. 2019), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource center/publications/401k-plan-fees.pdf (accessed April 21, 2026).

30

the assets of the Plan for the sole and exclusive benefit of Plan's participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

124.    The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint. Prudence Defendants did not make decisions regarding the Plan's offering of the TFLIC GIO  based solely on the merits of the investment and what was in the interest of Plan's participants. Instead, the Prudence Defendants selected and retained the TFLIC GIO in the Plan despite poor performance in relation to other comparable investments.

125.    As a direct and proximate result of the breaches of fiduciary duties alleged herein related to the TFLIC GIO, the Plan suffered millions of dollars of losses due to lower net investment returns. Had Prudence Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

126.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches. In addition, Plaintiff is entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in the Prayer for Relief.

127.    The Prudence Defendants knowingly participated in each breach, knowing that such acts were a breach, and failed to make any reasonable and timely effort under the circumstances to remedy the breaches.

## COUNT II
### Failure to Adequately Monitor Other Fiduciaries
### (against the Company)

128. Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint as if fully set forth herein.

129. Centra Health (the "Monitoring Defendant") had the authority to appoint and remove members of the Committee, and the duty to monitor the Committee and were aware that the Committee Defendants had critical responsibilities as fiduciaries of the Plan.

130. In light of this authority, the Monitoring Defendant had a duty to monitor the Committee to ensure that the Committee was adequately performing its fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Committee was not fulfilling those duties.

131. The Monitoring Defendant also had a duty to ensure that the members of the Committee possessed the needed qualifications and experience to carry out their duties; had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to the Company.

132. The Monitoring Defendant breached its fiduciary monitoring duties by, among other things, failing to monitor and evaluate the performance of the Committee or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Committee's imprudent actions and omissions.

133. As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars in losses. Had the Monitoring Defendant complied with its fiduciary

obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

134.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendant is liable to restore to the Plan all losses caused by their failure to adequately monitor the Committee. In addition, Plaintiff is entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

A.    A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B.    Designation of Plaintiff as Class Representative and designation of Plaintiff's counsel as Class Counsel;

C.    A Declaration that the Defendants have breached their fiduciary duties under ERISA;

D.    An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent monitoring of recordkeeping and administrative costs, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

33

E.      An order requiring the Defendants to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Defendants as necessary to effectuate said relief, and to prevent the Defendants' unjust enrichment;

F.      Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.      An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.      Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan's fiduciaries deemed to have breached their fiduciary duties;

I.      An award of pre-judgment interest;

J.      An award of costs pursuant to 29 U.S.C. § 1132(g);

K.      An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L.      Such other and further relief as the Court deems equitable and just.

Dated: June 4, 2026                              **CAPOZZI ADLER, P.C.**

*/s/ Mark K. Gyandoh*
Mark K. Gyandoh, Esquire
(Admitted *Pro Hac Vice*)
James A. Maro, Esquire
(Admitted *Pro Hac Vice*)
312 Old Lancaster Road

Merion Station, PA 19066
Email: markg@capozziadler.com
Email: jamesm@capozziadler.com
Phone: (610) 890-0200

John C. Cook, Esquire
**COOK LEGAL SOLUTIONS**
Virginia Bar Number: 38310
3975 University Drive
Suite 360
Fairfax, VA  22030
Phone:  (703) 537-0023
Email: jcook@cooklegalsolutions.com

*Counsel for Plaintiff and the Putative Class*

35

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 4th day of June, 2025, I electronically filed a copy of the foregoing using the CM/ECF system which will send a notification to all counsel of record in this Action.

/s/ Mark K. Gyandoh
Mark K. Gyandoh

36