UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

|  |  |
|---|---|
| ASHLEY FITCH, individually and on behalf of others similarly situated,<br><br>          Plaintiff,<br><br>   v.<br><br>CENTRA HEALTH, INC., et al.<br><br>          Defendants. | Case No. 6:26-cv-00001 |

### **DEFENDANTS' BRIEF IN SUPPORT OF MOTION TO DISMISS**

Plaintiff asks the Court to hold that Centra, by including a conservative investment option in its retirement savings plan, opened itself up to class liability because it did not instead offer one of a handful of other options that Plaintiff has cherry-picked for purposes of litigation. Plan fiduciaries are entitled to deference in making their decisions on what investments to include in their plan. Plan fiduciaries may not be penalized by offering conservative options in their investment plans, especially when, as here, the plan fiduciary followed a rigorous process in selecting and regularly monitoring the fund.

The factual allegations in Plaintiff's Amended Complaint fare no better than the original. Numerous courts, including one this week, have rejected the same claims by the same Plaintiff's counsel concerning the same type of investment. Here too, lacking a plausible claim that Centra's Retirement Savings Planning Committee breached their fiduciary duty in violation of ERISA, or a plausible failure to monitor claim under ERISA, the case should be dismissed.

1

**Background**[1]

1. <u>Statutory Framework</u>

ERISA is a comprehensive statute governing employee benefit plans, including retirement plans. *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 417 (4th Cir. 2007). The act does not require employers to establish employee benefit plans, nor does it "mandate what kind of benefits employers must provide if they choose to have such a plan." *Lockheed Corp. v. Spink*, 517 U.S. 882, 887 (1996). In enacting ERISA, Congress sought to strike a balance between "ensuring fair and prompt enforcement of rights under a plan and the encouragement of the creation of such plans," conscious that excessive "administrative costs, or litigation expenses, unduly discourages employers from offering [ERISA] plans in the first place." *Conkright v. Frommer*, 559 U.S. 506, 517 (2010) (citation omitted).

ERISA "requires the fiduciary of a pension plan to act prudently in managing the plan's assets." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 411–12 (2014) (citing 29 U.S.C. § 1104(a)(1)(B)). That means that "a fiduciary shall act 'with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.'" *DiFelice*, 497 F.3d at 417 (quoting 29 U.S.C. § 1104(a)(1)(B)). In addition, ERISA imposes on plan fiduciaries the duty of loyalty, that a fiduciary "shall discharge his duties … solely in the interest of the participants and beneficiaries." *Id.* at 417–18 (quoting 29 U.S.C. § 1104(a)(1)).

---

[1] Factual allegations in a complaint must be accepted as true on a motion to dismiss. *Coleman v. Maryland Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010).

2. <u>Stable Value Funds</u>

The Amended Complaint describes the type of fund at issue here, a "stable value fund," in some detail: "a conservative, fixed income investment vehicle that provides a relatively stable rate of return." First Amended Complaint ("FAC") ¶ 54. It cites a government report[2] that further explained, "[t]hough there are differences among various Stable Value Funds in general, a Stable Value Fund can generally be labeled as a conservative, fixed income investment vehicle with an objective of preserving capital while providing a relatively stable rate of return that generally exceeds the returns provided by money market funds." DOL Report.[3] They are and have been "an important investment tool for retirement plans covered by ERISA," and "an important tool in achieving a conservative fixed income return while preserving capital." *Id.*[4]

As of 2009, between one-half to two-thirds of all defined contribution plans offered stable value options. *Id.* Today, they remain "one of the most common capital preservation

---

[2] *See* FAC ¶ 54 (citing Department of Labor, Employee Benefits Security Administration, Advisory Council Report on Stable Value Funds and Retirement Security in the Current Economic Conditions (2010), available at https://www.dol.gov/agencies/ebsa/about-ebsa/about-us/erisa-advisory-council/2009-stable-value-funds-and-retirement-security-in-the-current-economic-conditions) ("DOL Report"). The Amended Complaint relies on the Report for its description of stable value funds, FAC ¶¶ 54–57, incorporating it by reference at least for that purpose and also subject to judicial notice. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

[3] *See also* U.S. Gov't Accountability Office, *401(K) Plans: Certain Investment Options and Practices that May Restrict Withdrawals Not Widely Understood*, at 9 (Mar. 2011), available at https://www.gao.gov/assets/gao-11-291.pdf ("Stable value funds are a fixed income investment option, designed to preserve the total amount of participants' contributions, or their principal, while also providing steady, positive returns set in the contract.") ("GAO Report").

[4] *See also Eibensteiner v. EssilorLuxottica*, No. 3:25-cv-2443, 2026 WL 1140895, at *1 (N.D. Tex. Apr. 27, 2026) ("Stable value funds are designed to preserve capital while providing periodic interest at a set or reset rate, typically determined in advance and adjusted at intervals.") (Mem. Op. attached as Exhibit A); Ex. A at 2.

3

options" available in retirement savings plans. *See* Thomas P. Lemke & Gerald T. Lins, *ERISA for Asset Managers and Collective Trust Funds* § 3:37 (Sept. 2025).

The Amended Complaint further alleges how several types of stable value funds operate. Namely, they "can be managed via guaranteed insurance contracts ('GICs'), in which the fund manager holds or invests in a single group annuity contract issued directly to the retirement plan and the plan sponsor receives a direct guarantee of principal and accrued interest from the issuer." FAC ¶ 55. There are "three types of GICs":

- Traditional GIC (or "insurance company general account"). Contract with an insurance company that guarantees a fixed rate of return "backed by the assets of the insurer's general account," and which fixed rate is guaranteed "regardless of the performance of the underlying assets, which the insurance company owns and holds within their general account."

- Separate Account GIC. Contract with an insurance company with a guaranteed rate of return "backed by assets held in a segregated account separate from the insurer's general account," and while "[t]he insurance company owns these assets … [they] are set aside in a separate account for the exclusive benefit of the participating plan."

- Synthetic GIC. Contract with bank or insurance company guaranteeing a rate of return relative to a portfolio of assets held in an external trust.

*See* FAC ¶¶ 55–57; DOL Report (providing quoted descriptions); *id.* ("There are numerous types of Stable Value Fund contracts; including traditional Guaranteed Investment Contracts (GICs), separate accounts contracts, and synthetic GICs….").

While stable value funds generally are conservative investments compared with other asset classes and have capital preservation as an aim, they vary in including differing underlying investments, accepting differing levels of risk, and offering differing returns. *See* FAC ¶¶ 55–57; *see id.* ¶ 119 (alleging that as a "general account product" TFLIC GIO "should have had a high credit rate given its riskiness"); DOL Report; *Jacobs v. Hackensack Meridian Health, Inc.*, No.

4

2:25-cv-1272, 2026 WL 710229, at *2–3 (D.N.J. Mar. 13, 2026) (describing different types, characteristics, risks, and returns of different stable value funds).

3.  <u>Centra Plan, Challenged Fund & Investment Selection & Review Process</u>

Centra is a regional nonprofit healthcare system based in Lynchburg that serves over 500,000 people and is a primary provider of critical medical services in central and southern Virginia. FAC ¶ 24. Centra's Health Matching Tax Deferred Savings Plan (the "Plan") is a defined contribution plan,[5] FAC ¶ 2, which means that its assets "are allocated to participants' individual accounts." *Trauernicht v. Genworth Fin. Inc.*, 169 F.4th 459, 467 (4th Cir. 2026); *see* 29 U.S.C. § 1002(34) (a defined contribution plan "provides for an individual account for each participant and for benefits based solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses … which may be allocated to such participant's account").[6] Centra is the Plan Sponsor and named fiduciary, serving without compensation. FAC ¶¶ 25–26. In 2020, the Plan had 9,434 participants and $661,578,023 under management; by 2024, the Plan had 10,247 participants and $669,994,115 under management. *Id.* ¶¶ 9–11.

Plaintiff's claims challenge the wisdom of including and retaining the Transamerica Financial Life Insurance Company Guaranteed Income Option ("TFLIC GIO"), a stable value fund, in the Plan. FAC ¶ 13. As alleged in the Amended Complaint, effective in September 2020, the TFLIC GIO was an available investment fund in the Plan. *Id.* ¶ 43. From 2020 until 2023,

---

[5] The Plan is a 403(b) plan, a tax-sheltered annuity plan offered by a tax-exempt organization and similar to a 401(k) plan. FAC at 1 n.1.

[6] By contrast, a "defined benefit plan" is a competing plan in which "the assets of the plan are held collectively and then are used to pay the defined and fixed benefits that the employer promised to plan participants." *Trauernicht*, 169 F.4th at 467.

approximately $64 million to $69 million in Plan assets were invested in the TFLIC GIO each

year. *Id.* ¶ 46. In 2024, it was removed from the Plan. *Id.* at 8 n.7.

As described in the Amended Complaint and cited Centra and Plan documents,[7] the

Retirement Savings Planning Committee (the "Committee") is comprised of at least five and no

more than twelve members, consisting of representatives of Centra and Captrust—its investment

advice co-fiduciary within the meaning of ERISA section 3(21)(A)(ii). *See* FAC ¶¶ 29–30 (citing

Committee Charter); Ex. B at 1 (Committee Charter).[8] By charter, the Committee holds quarterly

meetings during which it conducts oversight over its investment portfolio and supervises the

investments of the Plan in accordance with ERISA. Ex. B at 1–2. The Committee's oversight is

memorialized in minutes of its quarterly meetings, which minutes Centra provided to Plaintiff's

counsel upon their request back in December 2022. FAC ¶¶ 75–76. Plaintiff acknowledges the

committee's process of ongoing oversight over Plan investments is reflected in minutes which

she received—based upon independent reviews and analysis by co-fiduciary Captrust—which

the Amended Complaint cites dismissively without challenging its process on the merits. *See id.*

¶¶ 75–79; Ex. B at 1–2.

4.   Plaintiff's Claims

Plaintiff alleges that she participated in the Plan during her employment at Centra. FAC

¶ 21. She further alleges that she "invested in the TFLIC GIO in the Plan and suffered injury to

---

[7] By citing and relying on the Committee Charter provided to Plaintiff's counsel in the Amended Complaint, Plaintiff has incorporated it by reference. *See* FAC ¶¶ 29–30, 75–79; *Tellabs, Inc.*, 551 U.S. at 322.

[8] 29 C.F.R § 2510.3-21(c) (defining "fiduciary" within the meaning of ERISA section 3(21)(A)(ii)); *see also* Dep't of Labor Proposed Rule, *Fiduciary Duties in Selecting Designated Investment Alternatives*, 91 Fed. Reg. 16,088, 16,096 (Mar. 31 2026) (explaining that "plan fiduciaries may wish to work with an investment advice fiduciary (within the meaning of ERISA section 3(21)(A)(ii)) to understand and evaluate the performance of the investment").

her Plan account due to the significant underperformance of the TFLIC GIO." *Id.* She does not allege the dates of her employment; when she was invested in the disputed fund precisely; anything about her transaction, contribution or withdrawal history; or how much she claims to have lost based upon her investment in the fund. *Id.* Plaintiff alleges that in December 2022, she requested from Plan management "all written instruments" governing the Plan, including investment policy statements. *Id.* ¶ 75. In response, the Plan administrator provided meeting minutes but not investment policy statements. *Id.* ¶ 76.

A little over three years later, Plaintiff filed this ERISA complaint against Centra and the Committee. Plaintiff challenges Defendants' selection of the TFLIC GIO fund for the Plan and their alleged failure to remove it from the Plan earlier than they did. *Id.* ¶¶ 12–14, 79, 88. In response to Defendants' filing their motion to dismiss, Plaintiff filed this Amended Complaint. *See* Dkts. 28, 44.

In her Amended Complaint, Plaintiff acknowledges that the purpose of a stable value fund such as the TFLIC GIO is a conservative, fixed income investment vehicle that seeks to provide a stable rate of return. FAC ¶¶ 53–56; *id.* at 80 ("stated goal is to preserve income"). And she acknowledges she "does not have actual knowledge of the specifics of Defendants' decision-making process" in selecting investment options for the Plan and deciding which to maintain or remove. *Id.* ¶ 74. In substance, she claims that "the TFLIC GIO had chronically underperforming crediting rates when compared to other stable value [funds]," and thus Defendants' selection of the fund "was clearly a result of their lack of an investment review process, or … failure to implement a prudent investment review process." *Id.* ¶¶ 87–88. Plaintiff has included two claims in her Amended Complaint: Breach of Fiduciary Duty of Prudence (Count I); and Breach of Duty to Monitor (Count II)).

**Legal Standard**

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) challenges the legal sufficiency of the claims in a complaint. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556). Thus, the plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. But facts that are "merely consistent with" a defendant's liability fall short of establishing the "plausibility of 'entitlement to relief,'" required to survive a Rule 12(b)(6) motion to dismiss. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). "In other words, the complaint's factual allegations must produce an inference of liability strong enough to nudge the plaintiff's claims 'across the line from the conceivable to the plausible.'" *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 256 (4th Cir. 2009) (quoting *Iqbal* and *Twombly*).

A motion to dismiss for failure to state a claim under *Iqbal* and *Twombly* is an "important mechanism for weeding out meritless claims" that a plan fiduciary has acted imprudently. *Dudenhoeffer*, 573 U.S. at 425–26. And because, "[a]t times, the circumstances facing an ERISA fiduciary will implicate difficult tradeoffs, [ ] courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise." *Hughes v. Northwestern Univ.*, 595 U.S. 170, 177 (2022).

8

**Argument**

Plaintiff's claims involve classic Monday morning quarterbacking that courts have repeatedly rejected as a matter of law. Plaintiff's theory appears to be that, while "stable value funds" are "generally presented as one of the more conservative options for investors who prefer asset preservation to the risk of pursuing greater returns," here Defendants acted imprudently by "simply picking 'too conservative' a benchmark for a stable value fund." *See Ellis v. Fid. Mgmt. Tr. Co.*, 883 F.3d 1, 9 (1st Cir. 2018). Courts have roundly rejected similar claims that fault plans for including a conservative investment option, in lieu of one from a plaintiff's carefully-curated, litigation-driven list of alternatives that, with the comfortable benefit of hindsight, may have yielded higher returns over a finite period. The law is clear, however, that "whether a fiduciary's actions are prudent cannot be measured in hindsight," and that is true whether it "would accrue to the fiduciary's detriment or benefit." *DeFelice*, 497 F.3d at 424. It is no surprise then that numerous courts have been and are granting motions to dismiss the same claims by the same Plaintiff's counsel alleging ERISA planning committees have all breached the duty of prudence based on various stable value funds' alleged underperformance—yielding at least one adverse ruling per month, including the *Hensley* case two days ago that was dismissed with prejudice.[9]

That reasoning is decisive here. The Amended Complaint, replete with conclusory allegations, lacks factual allegations to state a plausible claim that the Committee violated ERISA's duty of prudence based upon alleged underperformance of the TFLIC GIO. Numerous courts have dismissed similar claims as Plaintiff's that allege underperformance based solely on

---

[9] *See EssilorLuxottica*, 2026 WL 1140895 (Apr. 27, 2026) (Ex. A); *Tedford v. Equitable Fin. Life Ins. Co.*, No. 2:25-cv-2180, 2026 WL 1398640, at *1 (D.N.J. May 19, 2026) (Mem. Op. attached as Exhibit C); *Hensley v. Molson Coors Beverage Co. USA LLC Gov. Comm.*, No. 2:25-cv-1371, 2026 WL 1878633, at *1 (E.D. Wis. June 30, 2026) (Mem. Op. attached as Exhibit D).

a few cherry-picked years' of comparison. Moreover, underperformance claims have been held

lacking where, as here, a plaintiff can allege nothing more than minimal differences in yields

even with her cherry-picked comparators (here, under 2%). The statute and its implementing

regulations also require the Amended Complaint to include factual allegations that the fund

underperformed reasonably available alternatives with similar risks, and of a like character and

with like aims. They are nowhere to be found. That's another independent basis for dismissal.

Plaintiff's duty to monitor claim fares no better. The Amended Complaint should be dismissed.

1.   The Factual Allegations Fail to State a Plausible Claim for Breach of Fiduciary Duty.

a.   *Conclusory Allegations Offer No Support*

The Amended Complaint alleges that Defendants' selection of the TFLIC GIO is so

outside the bounds of prudent decisionmaking—i.e., it was "underperforming" compared to

"similar," "comparable," and/or "identical" plans allegedly offering higher rates of return—that

Defendants must be personally liable for that imprudent process. Of course, the Amended

Complaint must allege facts (not mere labels and conclusions) that, taken as true, substantiate

that claim.

The Amended Complaint is chock full of labels and conclusions to that effect. *E.g.*, FAC

¶ 12 (alleging TFLIC GIO offered "lower crediting rates when compared to available *similar* or

*identical* investments with higher crediting rates") (emphases added); *id.* ¶ 13 (alleging it offered

"a significantly lower rate of return than other *comparable* stable value funds") (emphasis

added); *id.* ¶ 117 (alleging "underperform[ing] crediting rates" of TFLIC GIO). There are more.[10]

---

[10] *See also* FAC ¶ 23 (alleging lack of knowledge about "available alternatives within
similarly-sized plans"); *id.* ¶ 21 (alleging Plaintiff "suffered injury to her Plan account due to the
significant underperformance of the TFLIC GIO"); *id.* ¶ 91 (alleging that "[t]hroughout the Class
Period, identical or substantially identical stable value funds with higher crediting rates were
available to the Plan, but were not selected by Defendants"); *id.* ¶ 113 (alleging"[a] prudent

But such labels, conclusions or other "naked assertions" without "factual enhancement" are not entitled to a presumption of truth. *Iqbal*, 556 U.S. at 678–79; *Magnate, LLC v. U.S. E.P.A.*, 678 F. Supp. 3d 767, 777 (W.D. Va. 2023).

Stripped of this adornment, Plaintiff's allegation of underperformance of the TFLIC GIO—the sole basis for the breach fiduciary duty claim—is as sturdy as a house of cards. It rests upon the flimsiest of foundations: (i) allegations drawn only from a narrow 2020-2023 window, carefully selected by Plaintiff; (ii) allegations of under 2% average difference in returns, (iii) with Plaintiff's handful of carefully selected "comparators," about which either nothing at all is alleged, or for which the allegations completely fail to establish a meaningful comparison. Each of these is a pleading deficiency fatal to Plaintiff's breach of fiduciary duty of prudence claim.

Thus, while the factual basis for the alleged underperformance remains elusive in Plaintiff's Amended Complaint, she sees that as no impediment to asserting that TFLIC GIO should have delivered higher returns, like those allegedly offered by her preferred alternatives. However Plaintiff's claim is formulated, the law forbids plaintiffs from substituting their judgment viewed with the benefit of hindsight, for the plan's fiduciaries' contemporaneous judgment. *See Hughes*, 595 U.S. at 177.

b.  *No Underperformance Pleaded*

The Amended Complaint's non-conclusory factual allegations do not render plausible Plaintiff's claim that the TFLIC GIO was such an underperformer that Defendants' investment process was evidently deficient. While the Amended Complaint has been bulked up to provide a superficial appearance of plausibility, it is myopically focused on the years 2020–2023—a

---

fiduciary would have known that other providers of fixed annuities offer *substantially identical*, *better-performing* stable value investments").

11

purpose-built window from which it asks the Court to extrapolate alleged underperformance of the TFLIC GIO. FAC ¶ 109; *see also id.* ¶¶ 96–109. But using such a blinkered "snapshot" in time "does not suffice to plausibly plead an imprudent decision—largely a process-based inquiry—that breaches a fiduciary duty." *See Smith*, 37 F.4th at 1166.

It is no surprise that courts require plaintiffs to plead facts that support and give content matching their claims of underperformance. It is not enough to say ERISA fiduciaries breached their duty of prudence just because an investment lost value. *DiFelice*, 497 F.3d at 424 ("an investment's diminution of value is neither necessary, nor sufficient, to demonstrate a violation of a fiduciary's ERISA duties"). Or because other investments may have performed better. *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 823 (8th Cir. 2018) ("The fact that one fund with a different investment strategy ultimately performed better does not establish anything about whether the [challenged] funds were an imprudent choice at the outset."); *Smith*, 37 F.3d at 1166. Or that a challenged fund (like the stable value fund here), "was imprudent by virtue of being too conservative." *Ellis*, 883 F.3d at 11. Given these basic principles, a difference in value between several types of investments alone cannot support a claim for underperformance. As such, the Amended Complaint and other class action lawsuits often attempt to buttress underperformance claims by claiming there was underperformance over time.

Yet still, allegations that one challenged fund underperformed another—especially for a finite and discrete period—do little work to support a plausible claim for breach of fiduciary duty. Indeed, "[c]ourts routinely hold that alleged underperformance for three to five years is insufficient to plausibly allege imprudence." *Nolan v. Sonic Automotive, Inc.*, No. 3:25-cv-474, 2026 WL 1195596, at *7 (W.D.N.C. Apr. 30, 2026); *see also Smith*, 37 F.4th at 1166 ("Merely pointing to another investment that has performed better in a five-year snapshot of the lifespan of

a fund that is supposed to grow for fifty years does not suffice to plausibly plead an imprudent decision"); *Clinton v. Baxter Int'l Inc.*, No. , 2025 WL 3470685, at *7 (N.D. Ill. Dec. 3, 2025) (explaining that "to sustain his 'chronic underperformance' argument, [plaintiff's] comparisons must show persistent underperformance," and "four to six comparators each year from 2019 to 2023" are insufficient). As the Third Circuit recently explained, "short-term underperformance does not prove long-term imprudence." *In re Quest Diagnostics ERISA Litig.*, --- F.4th ---, 2026 WL 1783204, at *4 (3d Cir. June 22, 2026). Many other cases have similarly held that claims of underperformance against ERISA fiduciaries cannot be based on allegations of such a cramped timeframe-basis for comparison, like 2020 to 2023 as in the Amended Complaint.[11]

The Amended Complaint further fails to include factual allegations that the TFLIC-GIO, in fact, underperformed in any respect that would support a plausible claim of breach of the duty of prudence. Even within 2020–2023, the breach of fiduciary duty claim is based on the alleged ***underperformance of TFLIC-GIO to so-called "comparators" of just between 1% and 2% for three of the four years cited*** (1.34% in 2021, 1.49% in 2022, 1.65% in 2023); while in just one year (2020), the claimed underperformance was 2.91%. FAC ¶ 109.[12] Thus, even in Plaintiff's

---

[11] *See, e.g.*, *Macias v. Sisters of Charity of Leavenworth Health Sys.*, No. 23-cv-1496, 2025 WL 4095840, at *7 (D. Colo. Jan. 6, 2025) (holding that plaintiff's "comparisons of the three- and five-year returns" of alleged comparator funds and an index "from 2014-2018 fail to support an inference of imprudence"); *Cho v. Prudential Ins. Co. of Am.*, No. 19-cv-19886, 2021 WL 4438186, at *9 (D.N.J. Sept. 27, 2021) (explaining that plaintiff's reliance on five-year trailing performance data was "fairly short" and insufficient); *but see Jacobs v. Verizon Comm'cs, Inc.*, 2017 WL 8809714, at *9 (S.D.N.Y. Sept. 28, 2017) (denying motion to dismiss where fund return over a ten-year span was 1.74% compared to its benchmark, which returned 10.37% over that same ten-year period).

[12] These figures come from subtracting the TFLIC GIO rate of return from the alleged "comparator average rate of return." FAC ¶ 109 (i.e., in 2023, 3.87% – 2.22% = 1.65%). Perhaps reflecting an acknowledgment that simple math did not support a plausible breach of fiduciary claim, Plaintiff attempts to 'juice the numbers' by claiming there are "relative performance" differences between the funds of 40% to 85%. That approach makes little sense. If it carried the day, a hyper-conservative short-term investment yielding 0.1% would result in liability if another

cherry-picked four-year span, the basis for the claim of a breach of fiduciary duty is average underperformance of 1.84%. *Id.* The Court need go no further. Accepting Plaintiff's allegations, "minimal underperformance of one to four percent, without more, does not plausibly allege imprudence." *Nolan*, 2026 WL 1195596, at *7 (citing authorities); *Enstrom*, 820 F. Supp. 3d at 421–22 (where challenged funds "generally provided returns within one-to-two percentage points of plaintiffs' handpicked comparator funds, and the underperformance extend to at most around three percent," court held that "[u]nderperformance of this magnitude does not plausibly suggest a duty of prudence violation"). Other courts have likewise held that similar differences in rates of return—especially for narrow bands of time—fail to state a plausible ERISA claim.[13]

c. *No Consistent Benchmarks or Meaningful Comparators Pleaded*

Even assuming Plaintiff has sufficiently pled facts to allege underperformance with respect to duration and amount—and she has not—the breach of fiduciary duty claim also fails without factual allegations that establish a uniform and consistent benchmark, or a meaningful comparator. These are yet further, and independent, grounds for dismissal.

The Amended Complaint's allegations about the "underperformance" of the TFLIC GIO are further based on an attempted comparison with (1) about a dozen alleged other stable value funds with "similar characteristics," for which no basis for comparison is alleged and only sporadic and shifting information about their rates of return provided, FAC ¶¶ 99, 102, 105, 108; and (2) funds Plaintiff calls its "Comparator GICs" that are alleged to be "substantially identical"

---

so-called comparator fund could be found yielding 0.2%. It would appear, under Plaintiff's approach, that would be a 50% underperformance.

[13] *See, e.g.*, *Abel v. CMFG Life Ins. Co.*, No. 22-cv-449, 2024 WL 307489, at *5 (W.D. Wis. Jan. 26, 2024) ("[D]istrict courts around the country have rejected breach of fiduciary duty claims based on similar underperformance metrics, finding alleged, short-term differences in performance of between 1.14 to 4.4% immaterial.") (citing cases).

or "identical," except that they offered higher yields. *Id.* ¶¶ 91–94, 97, 100, 103, 106. But the bulk Plaintiff has added to her Amended Complaint with the multitude of charts have not remedied the fundamental pleading deficiency that it does not include factual allegations to establish a consistent and uniform benchmark or the existence of meaningful comparators to the TFLIC GIO—both of which are necessary to nudge Plaintiff's claims of underperformance across the line from possible to plausible.

A claim for violating the duty of prudence can be supported with factual allegations of direct evidence that the plan fiduciary employed "unsound methods" in making investment decisions, or, alternately, with "circumstantial factual allegations" from which the court can "reasonably infer … that the process was flawed." *Anderson v. Intel Corp. Inv. Pol'y Comm.*, 137 F.4th 1015, 1021–22 (9th Cir. 2025), *cert. granted*, No. 25-498, 2026 WL 120679 (Jan. 16, 2026). Because here, "the alleged facts do not directly address the process by which the Plan was managed,"[14] Plaintiff attempted to raise circumstantial factual allegations from which the Court could "reasonably infer from what is alleged that the process was flawed." *See EssilorLuxottica*, 2026 WL 1140895, at *2 (citation omitted); Ex. A at 5–6.

The duty of prudence is based on the level of skill a "prudent man" would deploy in conducting "an enterprise of a *like character and with like aims*." 29 U.S.C. § 1104(a)(1)(B) (emphasis added). Furthermore, ERISA regulations similarly ask whether the plan fiduciary considered "the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action compared to the opportunity for gain (or other return) associated with *reasonably available alternatives with similar risks*." 29 C.F.R. § 2550.404a-

---

[14] FAC ¶ 74 ("Plaintiff did not have and does not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan …"); *id.* ¶ 78 ("Plaintiff has drawn reasonable inferences regarding these processes based upon several factors.").

1(b)(2)(ii) (emphasis added). The Amended Complaint lacks factual allegations that would permit a "like-for-like comparison" with refence to a "sound and meaningful" benchmark. It also lacks factual allegations establishing that any so-called "comparator" is deserving of that name, being "of a like character and with like aims," and that is a "reasonably available alternative[ ] with similar risks." *See Matousek v. MidAmerican Energy Co.*, 51 F.4th 274, 279 (8th Cir. 2022); *Matney v. Barrick Gold of N. Am.*, 80 F.4th 1136, 1148 (10th Cir. 2023) (citing authorities from the Third, Sixth, Seventh, and Eighth Circuits); *Anderson*, 137 F.4th at 1022.[15, 16] And the recent decisions from the courts in the *EssilorLuxottica*, *Tedford*, and *Hensley* cases, among others cited below, demonstrate how materially similar allegations here offer no apples-to-apples comparison and thus fail to state a plausible claim for relief. *See* Exhibits A, C, D.

                    i.    No Consistent Benchmark Demonstrating Underperformance

Plaintiff claims that the TFLIC GIO "underperformed [thirteen] other GICs with similar characteristics." FAC ¶ 99; *id.* ¶¶ 102, 105, 108 (verbatim). Strangely, the Amended Complaint includes ***no description*** about any of these funds. They simply aren't mentioned. As a result, Plaintiff's labeling the funds as having "similar characteristics" to TFLIC-GIO, without

---

[15] *See, e.g.*, *Enstrom v. SAS Inst. Inc.*, No. 5:24-cv-105, 2026 WL 459258, at *6 (E.D.N.C. Feb. 12, 2026) ("The absence of a meaningful benchmark dooms plaintiffs' duty of prudence claim."); *Tullgren v. Hamilton*, No. 1:22-cv-856, 2023 WL 2307615, at *6 (E.D. Va. Mar. 1, 2023) (holding that the complaint fails to state a claim because the plaintiff "has not pled meaningful benchmarks against which this Court can assess his allegations of the fiduciaries' imprudence").

[16] To be sure, the overwhelming weight of authority confirms that a plaintiff seeking to bring a breach of fiduciary duty claim using circumstantial evidence must plead allegations to allow a "sound basis for comparison." *Anderson*, 137 F.4th at 1022 (citing cases). But, even if one were to proceed from the assumption that "comparative allegations are not required to state an ERISA claim," that does not relieve a plaintiff of his obligation to "adequately plead[] facts, direct or circumstantial, showing that he is entitled to relief." *Id.* at 1028–29 (Berzon, J., concurring). Here, having chosen to proceed with stating a claim for relief based on allegations about purported comparator funds rather than in some other manner, Plaintiff cannot cry foul if her allegations do not stack up to support the claim she has made.

including *any* factual allegations about the funds or explaining why they are indeed "similar" to the challenged fund here, is a legal conclusion that need not be credited. *See Iqbal*, 556 U.S. at 679 (legal conclusions "must be supported by factual allegations"). There is no factual basis for the Court to consider whether any of these are meaningful comparators, i.e., "of a like character and with like aims," or "reasonably available alternative[ ] with similar risks."

Moreover, Plaintiff's inclusion of these charts and their indiscriminate comparisons of crediting rates for these intermittent years adds little to Plaintiff's claim.

| 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|
| Baylor College Alina HCC Insurance American United | Baylor College Alina American United Gemba – Ohio Gemba – Principal | Baylor College Alina American United | |
| | | Int'l Imaging Jackson Nat'l Trugreen | |
| | | | Mattel Pomona Valley Valley Hospital Auto Owner's |

*See id.* (pp. 23–28) (plan names, years of data extracted from table).

Nine of the thirteen plans include *one* lone year's crediting rate as a comparison. *None* of the plans include even four years of data. In 2023, the Amended Complaint has allegations about three funds for which there is no other data. And for the two funds for which the Amended Complaint offers three years of data (Baylor College of Medicine and American United Life), the plans are quite different on their face. The former has plan assets 2.5 times those as Centra; and American United Life has 1/3 the participants. FAC ¶ 99 (p. 23). The lone "Auto Owner's" reference in these charts appears accidental and is addressed below.

17

The court in *Clinton v. Baxter, International Inc.*, recently dismissed a putative class complaint brought by the same Plaintiff's counsel as in this case for precisely this reason: the allegations "fail[ed] to identify a *uniform sample*" and "*consistent* benchmark[s]" against which to assess the allegations of "chronic underperformance." *Clinton v. Baxter Int'l, Inc.*, No. 1:25-cv-3368, 2025 WL 3470685, at *7 (N.D. Ill. Dec. 3, 2025) (emphases added). In fact, the complaint in *Clinton* included many of the same funds as included in this complaint, *plus* another year's worth of data. *See* Compl. ¶ 85, *Clinton v. Baxter Int'l Inc.*, No. 1:25-cv-3368, (N.D. Ill. Filed Mar. 28, 2025). Plaintiff's counsel offers less here. The court held that the plaintiff "must show—at minimum—that there were year-in, year-out better-performing alternatives that cast doubt on the Investment Committee's process for monitoring and renewing its own funds." *Clinton*, 2025 WL 3470685, at *7. And there, as here, Plaintiff "provides none, only a rotating cast of other funds with higher crediting rates," which "alone cannot support a claim of imprudence." *Id.* In *Hensley*, the court likewise held that the plaintiff's list of "comparators change year to year and thus fail to demonstrate the kind of continuing underperformance needed to raise an inference of imprudence." 2026 WL 1878633, at *4; Ex. D at 8.

Simply put, none of these 13 nebulous "GICs with similar characteristics," and Plaintiff's varied and sporadic allegations about their crediting rates, offer a uniform sample or consistent benchmark from which Plaintiff can support a claim of underperformance of the TFLIC GIO.

　　　　　　　　　ii.　No Apples-To-Apples Comparison Pleaded

Finally, Plaintiff claims Defendants failed in their duty of prudence because five cherry-picked self-styled "Comparator Funds" are "identical or substantially identical," just with higher

18

rates of return. FAC ¶¶ 91–94.[17] Again, the Amended Complaint lacks factual allegations that, taken as true, would show an apples-to-apples or "like-for-like" comparison between these funds and the TFLIC GIO.

Indeed, Plaintiff claims *all* stable value funds can be comparisons for purposes of comparing crediting rates, though Plaintiff concedes there are different types of stable value funds, FAC ¶ 57 ("There are generally three types of GICs …"), and that different funds have different levels of risk. *Id.* ¶ 56 (explaining that stable value funds' "associated level of risk is a creature of their *structural design* rather than their investment strategy"); *supra* at pp. 2–3. But Plaintiff does not stop there, she further claims myriad other types of investments—traditional GICs, collective investment trusts, fixed annuity contracts, and other stable value funds—should all be comparators. FAC ¶ 84. Of course, Plaintiff's broad-brush attempt to paint all of these into "comparators" of the TFLIC GIO proves far too much. And it exposes how the Amended Complaint is lacking the requisite substantial factual allegations to establish any meaningful, apples-to-apples comparison.

Plaintiff lumps these various categories of investments stitched together by alleged common factors: benefit-responsiveness, insurer cannot prematurely terminate the contract, subject to regular rate review, and insured by creditworthy insurers. *Id.* ¶ 59. Plaintiff's counsel has already attempted that very sleight-of-hand in other cases, and courts have rejected it. For instance, the court in *EssilorLuxottica* also addressed the same allegations that "comparator investments share[d] key characteristics" with the challenged fund, including that the

---

[17] These are the Auto Owners Insurance Company Retirement Savings Plan which offered a GIC through its wholly owned subsidiary; the Ford Foundation Retirement Plan; the Ameritas 401(k) Retirement Plan; the "Standard 401(k) Plan," and Transamerica's own 401(k) Retirement Savings Plan. FAC ¶ 92–93.

comparators were "fully-benefit responsive," the "insurer cannot terminate the contract prematurely," they were "subject to regular rate review," and "issued by creditworthy insurers." See *EssilorLuxottica*, 2026 WL 1140895, at *3; Ex. A at 3. Indeed, the allegations in that case were verbatim to those in the Amended Complaint, except for the name of the challenged fund. *Compare* FAC ¶ 59, *with EssilorLuxottica*, No. 3:25-cv-2443, Am. Compl. ¶ 100 (N.D. Tex. Dec. 22, 2025) (Dkt. 20). Yet the court saw through the attempted gloss of similarity between the challenged and other stable value funds, holding that "the allegations regarding the comparators' characteristics remain largely high-level and are wanting for substantial factual detail concerning their underlying structure, contractual terms, or specific risk exposures." *Id.* In other words, despite the plaintiffs' allegations on "differences in crediting rates and quantified performance, the amended complaint provides limited information from which to assess whether the comparator investments were similar in material respects." *Id.*

The court in *Tedford* similarly rejected another attempt by the same Plaintiff's counsel looking to draw—as here—comparisons between stable value funds based largely upon plaintiff's "chart of GICs with varying amounts of assets and plan participants" and crediting rates. 2026 WL 1398640, at *4; Ex. C at 9. In ruling that the plaintiff "did not establish that the comparator GICs … are sufficiently similar to the [challenged fund] to constitute meaningful benchmarks," the court explained that "crediting rates are not the only characteristics of GICs that fiduciaries consider when choosing investments." *Id.* Rather, factual allegations must be provided concerning the "specific characteristics and plan goals" for the court "to determine [whether] they are 'sufficiently similar' for the purpose of being 'meaningful benchmarks' supporting an inference of imprudence." *Id.*

There's more. Numerous courts have also rejected similar attempts, including those advanced by Plaintiff's counsel here, to hold plan fiduciaries liable for alleged underperformance of funds compared with a different, often riskier, type of investment. In *Jacobs v. Hackensack Meridian Health, Inc.*, the court concluded that the same Plaintiff's counsel "failed to raise an inference that Defendant breached its duty of prudence," when they "chose[] to make that claim by comparing the crediting rates of two general account GICs against the TIAA [stable value fund], a separate account GIC, without providing the necessary context for the Court to ascertain whether that is a fair comparison to draw." 2026 WL 710229, at *11. *Jacobs* exposes the same failure to plead sufficient facts to state a plausible claim here as well. Plaintiff's counsel fared no better in *Enstrom v. SAS Institute, Inc.*, in which they sought to allege underperformance of a JP Morgan target date fund offering a "to" retirement glidepath, when "[a]ll plaintiffs' comparators follow a 'through' retirement glidepath."[18] 2026 WL 459258, at *6. In granting the plan's motion to dismiss, the Court explained that "[t]his difference renders plaintiffs' duty of prudence claim less plausible: riskier investments generate higher returns, so the different performance plaintiffs allege does not lead to the plausible inference that defendants were imprudent for investing in and retaining the JPM funds." *Id.*

And just days ago in *Hensley*, the court considered a similar argument that a Fidelity synthetic stable value fund had allegedly underperformed a host of "putative comparator funds." 2026 WL 1878633, at *1, 4; Ex. D at 2, 7–8. Since the "Plaintiff must compare apples to apples to prevail," the court rejected the plaintiff's attempt to compare a synthetic stable value fund to a

---

[18] The court explained that "[a] 'to' retirement glidepath reaches its most conservative asset allocation at the retirement date, while a 'through' retirement glidepath continues to adjust and becomes more conservative for several years after the retirement date." *Enstrom*, 2026 WL 459258, at *1 (cleaned up).

traditional GIC, explaining that "that fund is sufficiently dissimilar to belie any fair comparison." *Id.* at *3–4; Ex. D at 6–8. Further still, the court agreed with the defendants that the Plaintiff's putative comparisons relied on "a shortlist of qualities so generic that it describes practically any stable-value product." *Id.* at *4; Ex. D at 7–8.

These and other similar decisions demonstrate that claims of alleged underperformance or higher fees of a plan fund, without accompanying factual allegations that so-called comparator funds were in fact, meaningful benchmarks, from which an apples-to-apples comparison can be drawn, do not support a plausible claim for violation of the duty of prudence.[19]

Here, Plaintiff tellingly omits from the Amended Complaint factual allegations that, taken as true, would show the funds employ similar investment strategies, hold similar investments, or reflect similar risk profiles. *See Matousek*, 51 F.4th at 281. Defendants, and the Court, are left to wonder. That cannot be. By statute and regulation, those are key criteria for any meaningful comparison. 29 U.S.C. § 1104(a)(1)(B) (consideration of "an enterprise of a like character and with like aims"); 29 C.F.R. § 2550.404a-1(b)(2)(ii) (looking to "reasonably available alternatives with similar risks"). And even the slightest scrutiny of those self-styled "comparator fund" allegations demonstrates there is no apples-to-apples comparison alleged. Plaintiff alleges that

---

[19] *See, e.g.*, *Hanigan v. Bechtel Global Corp.*, 1:24-cv-875, 2025 WL 77389, at *2 (E.D. Va. Jan. 10, 2025) (holding that the complaint "fails to allege a meaningful benchmark to support Hanigan's excessive fee claim," where it "does not contain any allegation that the asset allegation models" for the challenged and comparator plans "are comparable"); *Hall v. Capital One Fin. Corp.*, No. 1:22-cv-857, 2023 WL 2333304, at *6 (E.D. Va. Mar. 1, 2023) (explaining that "the Blackrock [Target Date Funds or "TDFs")] were allegedly outperformed by some other TDFs at some points during a three- or five-year window, without more, does not suggest that offering the Blackrock TDFs fell outside the 'range of reasonable judgments' that fiduciaries may make.") (citing *Hughes*, 595 U.S. at 177); *Gaetano v. MVHS, Inc.*, No. 6:25-cv-118, 2026 WL 850360, at *8–10 (N.D.N.Y. Mar. 27, 2026) (citing, "despite the complaint's nine pages of tables showing that alleged comparator plans paid less for their recordkeeping services … the complaint is devoid of any factual allegations regarding the services the other recordkeepers provided to the allegedly similar-sized plans").

the TFLIC GIO is a traditional GIC / stable value product. FAC ¶¶ 57, 89 (alleging TFLIC GIO

"is a general account product that should have had a high credit rating given its riskiness"). And

Plaintiff recognizes there are different types of stable value funds which have differing levels of

risk. *Id.* ¶¶ 57, 89; *cf. Hensley*, 2026 WL 1878633, at *1; Ex. D at 2 (claiming that challenged

"synthetic" stable value fund "carried significantly more risk and provided a significantly lower

rate of return than comparable funds"). Yet Plaintiff alleges nothing about the type of stable value

fund these purported "comparators" are (i.e., traditional, synthetic, separate account), for four out

of the five. FAC ¶ 92. That failure alone dooms any attempt to draw a "meaningful comparison"

between the investments. *Hensley*, 2026 WL 1878633, at *4; Ex. D at 7–9; *EssilorLuxottica*,

2026 WL 1140895, at *1, 3; Ex. A at 2, 8.

What paltry allegations are provided about the putative "comparators" do not make up for

the confounding lack of factual allegations in these key respects. If anything, they show a vast

gulf between their characteristics and those of the TFLIC GIO. For instance, the Ford Foundation

Plan had between 126–228 participants. The Centra Plan had between 40–70 times as many.

FAC ¶¶ 97–106. And there's no allegation about the type of stable value fund that was. *Id.* ¶ 92.

The remaining ones are, on their face, highly dissimilar. The Auto Owners Insurance Company

Retirement Savings Plan has Auto-Owners Insurance Company as its insurance carrier. Then

there is the Ameritas 401(k) Retirement Plan, with Ameritas Life Insurance as insurance carrier;

The Standard 401(k) Plan with Standard Insurance as insurance carrier; and the Transamerica

401(k) Retirement Savings Plan with Transamerica Financial Life as insurance carrier. In other

words, not only are there no factual allegations to serve as connective tissue showing any of

these offer an apples-to-apples comparison with the TFLIC GIO, but Plaintiff's own allegations

demonstrate how these are not "comparator" funds. And further, the remaining allegations do not

23

establish that these so-called comparators are anything more than funds that present "different risks" and offer "different potential rewards"—but "[c]omparing apples and oranges … is not a way to show that one is better or worse than the other." *CommonSpirit Health*, 37 F.4th at 1166.[20]

Courts consistently hold that a claim of imprudence cannot "come down to simply pointing to a fund with better performance." *CommonSpirit Health*, 37 F.4th at 1166; *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 823 (8th Cir. 2018) ("No authority requires a fiduciary to pick the best performing fund."); *cf. Hughes*, 595 U.S. at 177 ("courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise"); *DiFelice*, 497 F.3d at 424 ("whether a fiduciary's actions are prudent cannot be measured in hindsight"). At bottom, the allegations in the Amended Complaint do nothing more than point to a handful of other funds with better performance. But without factual allegations from which the Court could establish a consistent benchmark and apples-to-apples comparator, Plaintiff's breach of fiduciary duty of prudence claim should be dismissed.

2.   <u>Plaintiff's Duty to Monitor Claim Fares No Better</u>.

In Count II, Plaintiff alleges that Centra failed to adequately monitor the other fiduciaries to ensure they were fulfilling their fiduciary obligations. FAC ¶¶ 128–34. But because a failure to monitor claim "derives from and depends on an underlying breach of fiduciary duty cognizable under ERISA," as no "plausible underlying fiduciary breach" has been alleged, the "derivative monitoring claims cannot survive." *Steen v. Sonoco Prods. Co.*, No. 4:24-cv-3105, 2025 WL 2420725, at *7 (D.S.C. June 5, 2025).

---

[20] Plaintiff argues that data in an article from the Stable Value Investment Institute of America supports the claim that TFLIC GIO underperformed meaningfully. FAC ¶¶ 114–16.  It doesn't. The so-called comparison data is from 2010 to *2019*, upon which Plaintiff asks the Court to compare TFLIC GIO's performance from *2020 to 2024*. The time periods don't align. Again, this is apples and oranges.

3.  <u>Plaintiff Lacks Standing to Pursue Injunctive Relief</u>.

Plaintiff is no longer employed by Centra and is no longer invested in the Plan. *See* FAC ¶ 21 ("During [Plaintiff's] employment, [she] *participated* in the Plan."). Yet as a named plaintiff and as representative of a putative class, she seeks not just retrospective relief but also prospective, injunctive relief. *Id.* at p. 34(G) ("An order enjoining Defendants from any further violations of their ERSA fiduciary responsibilities, obligations, and duties."). Of course, each class member "must demonstrate standing separately for each form of relief sought." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167,185 (2000). And "a plaintiff seeking prospective injunctive relief may not rely on prior harm to establish Article III standing," *Abbott v. Pastides*, 900 F.3d 160, 176 (4th Cir. 2018), but instead "must establish an ongoing or future injury in fact," *Kenny v. Wilson*, 885 F.3d 280, 287 (4th Cir. 2018). The plaintiff also bears the burden of establishing that the injury asserted is redressable. *Laidlaw*, 528 U.S. at 180–81. As a former employee and former Plan participant, she faces no "ongoing or future injury" from the Plan, nor would the forward-looking relief that Plaintiff seeks impact her in any way. She lacks standing to pursue injunctive relief.[21]

**Conclusion**

Defendants respectfully request that the Court grant their motion to dismiss.

---

[21] *See, e.g.*, *Fitzpatrick v. Neb. Methodist Health Sys., Inc.*, No. 8:23-cv-27, 2024 WL 6977298, at *5 (D. Neb. Sept. 20, 2024) (rejecting injunctive relief claim by same Plaintiff's counsel, and explaining that, "[a]s former, not present, plan participants, [the plaintiffs] have not alleged a real or immediate threat of future injury based on the defendants' conduct."); *Mehlberg v. Compass Grp. USA, Inc.*, No. 2:24-cv-4179, 2026 WL 1021456, at *5 (W.D. Mo. Apr. 9, 2026) (explaining that, "[a]s former Plan participants, Named Plaintiffs have not alleged a real or immediate threat of future injury based on Defendant's conduct" and therefore "lack standing to pursue prospective relief"); *cf. Trauernicht*, 169 F.4th at 465 (noting that district court previously "recognized that Trauernicht and Wright, as former participants in the Plan, lacked standing to obtain prospective relief and therefore dismissed their claim for injunctive relief pursuant to Rule 12(b)(1)").

Dated: July 2, 2026

Respectfully submitted,

/s/  J. Benjamin Rottenborn

J. Benjamin Rottenborn (VSB No. 84796)
Jamie H. Wood (VSB No. 97297)
WOODS ROGERS VANDEVENTER
BLACK, PLC
P.O. Box 14125
Roanoke, VA 24038-4125
Telephone: (540) 983-7600
Facsimile: (540) 983-7711
ben.rottenborn@woodsrogers.com
jamie.wood@woodsrogers.com

Robert A. DeRise (VSB No. 78431)
WOODS ROGERS VANDEVENTER
BLACK, PLC
828 Main Street, 19th Floor
Lynchburg, VA 24504-1522
Telephone: (434) 846-9000
Facsimile: (434) 846-0337
robert.derise@woodsrogers.com

*Counsel for Defendants*
*Centra Health, Inc. and*
*Centra Health, Inc. Retirement Savings*
*Planning Committee*